Green, Judge,
delivered the opinion of the court:
The plaintiffs in this case bring suit for a sum not specified in the petition, but if substantially all their claims are sustained they would be entitled to a judgment of several millions of dollars. Both the defendant and the intervenor, the Bed Lake Band of Chippewa Indians, contravene the allegations of the petition and the defendant sets up some other defenses which, in our view of the case, it is not necessary to consider. The case comes here under a congressional reference. The terms of the statute referring it, so far as material to the determination of the case, are fully set out in the findings and will be referred to in the opinion in the course of the discussion of plaintiffs’ case. The act authorized this court, notwithstanding the lapse of time or statutes of limitation, to hear and adjudicate any and all legal and equitable claims which the Chippewa Indians of Minnesota may have arising or growing out of the act of January 14, 1889, or any subsequent act of Congress, which have not heretofore been determined and adjudicated on their merits by the Supreme Court or this court. The basic allegation of plaintiffs’ petition is that by the act of January 14, 1889, to which reference will hereinafter be made, an agreement was made with all of the various bands of the Chippewa Indians, including the Bed Lake Indians, by virtue of which “ there was an immediate and complete cession of all right, title, and interest of all the different bands or tribes of said Indians and of the United States in and to all ceded lands, in trust for the exclusive use and benefit * * * [of] all the Chippewa Indians in the State of Minnesota ”, being the plaintiffs herein; and that by the act of February 20, 1904, to which reference will hereinafter be made, the defendant unlawfully took 666,434.64 acres of land from the corpus of the trust created as above stated without compensation to plaintiffs therefor, and included the same in a new and wholly different trust created for a different body of beneficiaries, being the Bed Lake Band *461 of Chippewa Indians, and the plaintiffs ask judgment for the value of the lands which they allege to have been thus unlawfully appropriated by the defendant.
No question seems to be raised as to the right of plaintiffs to sue in the name of all of the Chippewa Indians, although the Eed Lake Indians, as intervenors, deny the allegations of the petition and join with defendant in resisting the claims made by plaintiffs.
The defendant contends that prior to the agreement made with the Indians under the act of 1889 the Eed Lake Band of the Chippewa Indians had for a long time been owners of a large tract which included the lands which plaintiffs now allege to have been unlawfully appropriated. The defendant admits that by said agreement a large tract of land was ceded to the United States in trust for all the Chippewa Indians, but alleges that under this agreement another large tract which included the lands in controversy jn this case was reserved to be allotted to the Eed Lake Indians in severalty and that the lands so reserved continued to be the property of the Eed Lake Band.
While plaintiffs do not specifically deny that the Indian title to the lands in controversy rested with the Eed Lake Indians prior to the time the proceedings were commenced upon which they rely, as above stated, we think that much of the argument presented in behalf of the claims is inconsistent with the theory that the Eed Lake Indians had any exclusive rights therein and it is therefore important, if not absolutely necessary, to determine the rights of the Eed Lake Band with reference to the reservation which it occupied. For this purpose it is necessary to consider the history of the Chippewa Indians and in particular of the Eed Lake Band so far as it is material to this subject. In so doing, for convenience, we shall use in the course of this opinion in referring to the Indian title such words as “ ownership ”, “ belonging to ”, or similar expressions, although it is well understood with reference to these lands and other lands commonly spoken of as being owned by other tribes that the Indians actually had only a right of occupancy therein and the fee title was in the United States.
*462 The Chippewa Indians constituted one of the largest tribes of Indians north of Mexico, and their range was formerly along the shores of Lakes Huron and Superior and extended across Minnesota into North Dakota. In the beginning of the eighteenth century the Chippewas drove the Foxes from north Wisconsin, and then turning against the Sioux drove them across the Mississippi and south to the Minnesota Eiver and continued their westward march across Minnesota and North Dakota until they occupied the headwaters of the Eed Eiver. They had a large number of villages, bands, and local divisions scattered over a region extending a thousand miles from east to west. Some of the bands bore the names of the village, lake, or river near which they resided. Among these was a band living about Eed Lake and Eed Lake Eiver, north Minnesota, and a band living on Pembina Eiver in extreme north Minnesota and the adjacent part of Manitoba. Eventually the various bands of the Chippewa Indians were grouped under larger divisions or subtribes which occupied certain lands, the boundaries of which were sometimes definitely known and at other times indefinite.
Beginning in 1785, numerous treaties were made with the Chippewa Nation, including major and minor subdivisions thereof. As early as 1886, and since that year, many treaties were made in which either a separate band or a few separate bands of Chippewas were made parties. By these treaties, reservations were granted in the State of Minnesota, or cessions were accepted from various bands which became grouped under the name of the Chippewas of Minnesota, and for these cessions considerations in money and services were paid by the United States to or for the benefit of the band or bands with which the treaties were made. By the treaty of September 30,1854, the Chippewas were divided into the Chippewas of Lake Superior and the Chippewas of the Mississippi and were treated with as separate parties. By this treaty these two large subdivisions of the Chippewa Nation agreed on a north-south boundary line running through the eastern part of Minnesota which effected a division of the Chippewa country between them. This treaty shows that the Chippewas of Lake Superior relinquished their interest in the lands lying *463 to the west of the said boundary line, which includes the Eed Lake Eeservation.
This treaty also provided that the Fond du Lac, Bois Forte, and Grand Portage Bands relinquished absolutely any ownership in the Eed Lake Eeservation. This fact should be kept in mind when we come to consider the claim of the plaintiffs that at the time of the execution of the agreement of 1889 the Eed Lake Eeservation was owned in common by all of the Chippewa Indians of Minnesota and that for this reason it was necessary that these bands with others should relinquish their rights therein.
Between 1841 and 1813, the United States by various treaties, acts, and Executive orders, to which reference is made in findings III and Y, granted reservations for the sole use of and accepted cessions from one or more separate bands of Chippewas living in Minnesota, paying valuable considerations for the ceded land to the separate band or bands with which the treaties were made. Without referring to all of these treaties, it may be said that one was made with the Chippewa Indians of the Mississippi and Lake Superior on August 2, 1847; with the Pillager Band on August 21, 1847; again with the Chippewa Indians of Lake Superior and the Mississippi on September 30,1854; with the Mississippi, Pillager, and Lake Winnibigoshish Bands of Chippewa Indians on February 22, 1855, and again on March 11, 1863; with the Eed Lake and Pembina Bands on October 2, 1863, and again on April 12, 1864; with the Chippewas of the Mississippi, the Pillager, and Lake Winnibigoshish Bands on May 7,1864; with the Bois Forte Band on April 7,1866; and with the Chippewas of the Mississippi on March 19, 1867.
An act of Congress approved June 19, 1860, provided for negotiations with the Eed Lake and Eed Eiver Chippewas in the State of Minnesota for the extinguishment of their title to lands in that State, and resulted in a treaty with the Eed Lake and Pembina Bands of Chippewa Indians on October 2, 1863, under which the Eed Lake Indians ceded to the United States about 8,000,000 acres of land in consideration of payment of $20,000 per annum for twenty years and other valuable considerations. The treaty also in effect *464 fixed the western boundary of their reservation, the eastern and southern boundaries having been delimited by the treaty of 1855. No other Indians joined in this cession or received any compensation for it, and the Government always treated the land so ceded as a part of the public domain. The treaty of 1863 provided that the Eed Lake and Pembina Indians should be paid for the land so ceded by certain annuities therein provided and there were other valuable considerations given. The treaty of 1863 was subsequently modified by the treaty of April 21,1864, which somewhat changed the consideration to be given by the Government to the Eed Lake Indians and made some'other minor changes. In 1864 the Chippewas of the Mississippi, the Pillager, and Lake Winnibigoshish Bands of Chippewa Indians in Minnesota ceded certain lands to the United States, and the United States agreed to set apart for the Chippewas of th'e Mississippi certain lands the boundary line of which was described in part as “ along the line of the Eed Lake Eeservation.” In 1872 the Secretary of the Interior transmitted to the House of Eepresentatives an estimate of appropriation for surveying Indian reserves under treaty stipulations, among which was on'e for the survey of the Eed Lake and Pembina Eeservation in Minnesota set apart under the treaty of October 2, 1863, and subsequently the outboundaries of the Eed Lake Eeservation were surveyed. In an Executive order of March 18,1879, the President withdrew from sale and settlement a tract of land delimited in part by the boundaries of the “ Eed Lake Indian Eeservation.” To the President’s message of January. 25,1886, was appended the report of the Secretary of the Interior in which it was said of the Eed Lake and Pembina Chippewas of the Eed Lake Eeservation that “ They own and occupy an immense area of country north of White Earth, which has never been ceded to the United States; the Indians still retaining all their original rights in the soil.”
On February 11,1887, the Commissioner of Indian Affairs stated in a communication to the Secretary of the Interior: “ It should be premised that the Eed Lake Eeservation has never been ceded to the United States ”, except that by the treaty of October 2,1863, “ the Eed Lake and Pembina Bands *465 of Chippewa Indians ceded to the United States all the lands, claimed and owned by them in Minnesota and Dakota within certain described boundaries ”, and that “ this cession determined the boundaries of the Red Lake Reservation on the west and south ”; also that “ the east boundary had previously been established by the treaty of February 22, 1855.” The communication also referred to the cession of a tract of land by the Mississippi Chippewas and stated that “ the land lying between and north of the boundaries of these two cessions was thus recognized as the country of the Red Lake and Pembina Bands, to which these Indians have all the original rights of Indian occupancy attaching to unceded Indian lands.”
On January 3, 1889, in response to a request made by the President, the Commissioner of Indian Affairs reported, among other things, that none of the Indians of the State of Minnesota, “ except the Red Lake Indians, have any right, title, or interest in the Red Lake Reservation.” In instructions issued by the Commissioner of Indian Affairs with the approval of the Secretary of the Interior on May 24,1889, to the Commissioners appointed under the provisions of the act of January 14,1889, there was stated:
“ It has not heretofore been claimed by any one, md so far as the knowledge of this office extends, and certainly not by the Indians themselves, that the Bed Lake Reservation is the common property of all the Chip fewa Indians in Minnesota. None but the Red Lake and Pembina Bands have ever claimed an interest in said reservation, and said bands have always been recognized and regarded as the sole owners by right of original Indian occupancy, the lands having never been ceded to the United States.” (Italics ours.)
As a result of the treaties or agreements with the Government and apparently by perfect agreement among themselves, the Chippewas of Minnesota long prior to the act of 1889 resided on twelve reservations, the total area of which was approximately 4,141,931 acres. Eleven of these reservations had been expressly described and set apart for the specific use of the band or bands occupying and belonging to the same, as shown by the treaties and Executive orders to which reference is hereinbefore made. The remaining reser *466 vation, comprising approximately 3,200,000 acres, was situated around Upper and Lower Red Lakes in the northwestern part of Minnesota. It was officially known as the Red Lake Indian Reservation and was occupied and used exclusively by the Red Lake and Pembina Bands of Chippewa Indians and its boundaries had been determined.
From what is recited above, it will be seen that as far back as 1863, twenty-six years before the agreement was signed under which plaintiffs now make their claim, the Government conceded the ownership by the Red Lake and Pembina Bands of the lands which they occupied, and agreed to pay a large sum to them in the way of annuities in consideration of part of the land being ceded; that subsequently by repeated acts they were recognized by the Government and its various officials as the only Indians that had any right to what eventually became known as the Red Lake Reservation. Keeping in mind that this condition existed at the time when the act of 1889 was passed and the agreement made with the Red Lake Indians, we think the error of some of the conclusions upon which the case of the plaintiffs rests will be made evident as we reach them in the further discussion of plaintiffs’ claims.
The plaintiffs, in support of their contention that there was a cession of all right, title, and interest which the different bands or tribes of Indians had in the Red Lake Reservation to the United States in trust for the use and benefit of all of the Chippewa Indians of the State of Minnesota, rely in part on the report of the Committee on Indian Affairs accompanying a bill known as H. R. 7935, which, after several amendments, became the act of January 14,1889, under which the treaty of 1889 with the Chippewa Indians was subsequently made.
This report of the committee declared that—
“ The so-called Red Lake Reservation is simply a remnant of unceded Indian Territory occupied at present by the Red Lake Band, but really the common property, so far as the Indian title is concerned, of all the Chippewa Indians in Minnesota.”
The committee also referred to an inchoate agreement which had been made with the Chippewas of the Red Lake *467 Reservation pursuant to provisons contained in the Indian Appropriation Act of May 15,1886, and stated that this agreement was “ open to serious objection in ” giving the Red Lake Indians “ in perpetuity a tribal fee title ” to a million acres of land. The committee further declared that the only proper way to deal with the Indians was by allotting lands in sever-alty to them and breaking up their tribal relations and ownership. Another part of the report of the committee said that all of the Chippewas in Minnesota really belonged to one family, and that the Red Lake Reservation was a remnant of all that country once occupied by them in common and thus a sort of common property. The committee stated that to carry out its views the bill H. R. 7935 had been prepared, which was “ in the nature of a proposal to the Indians, and if not accepted by them is inoperative and nugatory. If accepted and assented to by at least two-thirds of the male adults of each band, the bill, if passed, becomes effective.” (Italics ours.) We shall call attention later on to the last sentence, which becomes important in determining whether the bill as finally enacted is subject to the construction which plaintiffs seeks to place upon it. It must be admitted that the committee report recognizes a right of other Indians in the Red Lake Reservation, but we think we have shown that it is based upon a complete misapprehension of the facts, which were, as stated above, that the Government had as far back as 1863 recognized that the Red Lake Reservation belonged to the Red Lake Indians, that some of the other bands of the Chippewas who were expected to join in the treaty had expressly relinquished any interest in it, and that none of the other Indians claimed any interest therein and the Government had repeatedly treated the reservation as belonging exclusively to the Red Lake Indians.
While much of the argument of plaintiffs is based upon the committee report that preceded the act of January 14, 1889, plaintiffs specially rely upon the act itself. It is insisted that this act recognized the common ownership of the Red Lake Reservation by all the Chippewas and created a trust for their benefit and the benefit of the plaintiffs. Without considering whether the Government could lawfully appro *468 priate the lands of the Red Lake Indians for the benefit of some other bands, we proceed to an examination of the provisions of the bill which it is contended sustain this claim on the part of plaintiffs.
By section 1 of the act the President was directed to appoint three commissioners:
“ * * * to negotiate with all the different bands or tribes of Chippewa Indians in the State of Minnesota for the complete cession and relinquishment in writing of all their title and interest in and to all the reservations of said Indians in the State of Minnesota, except the White Earth and Red Lake Reservations, and to all and so much of these two reservations as in the judgment of said commission is not required to make and fill the allotments required by this and existing acts, and shall not have been reserved by the Commissioners for said purposes, for the purposes and upon the terms hereinafter stated.”
This was followed in the act by a provision upon which the plaintiffs specially rely, as follows:
“ *• * * such cession and relinquishment shall be deemed sufficient as to each of said several reservations, except as to the Red Lake Reservation, if made and assented to in writing by two-thirds of the male adults over eighteen years of age of the band or tribe of Indians occupying and belonging to such reservations; and as to the Red Lake Reservation the cession and relinquishment shall be deemed sufficient if made and assented to in like manner by two-thirds of the male adults of all the Chippewa Indians in Minnesota; and provided that all agreements therefor shall be approved by the President of the United States before taking effect.”
The first of these provisons, it will be observed, provided for negotiations with the different bands or tribes of Chippewa Indians and thus recognized that each band had title to the land which it occupied independent of the others, otherwise it would have provided for negotiations with the Chippewas as a whole. It prescribed the powers which were granted to the Commissioners. It is urged by plaintiffs that the Commissioners exceeded these powers in the agreement which was made with the Red Lake Indians.
Even if this were the case, the effect of the contract made with the Indians must be determined by the terms of the agreement which they executed. But we do not think the *469 Commissioners exceeded the powers granted by the act. In our opinion, they acted strictly in accordance with it, as will appear hereinafter from a discussion of its terms in connection with the agreements made by the Commissioners appointed thereunder and signed by the several bands of the Chippewa Indians of Minnesota.
Pursuant to the provisions of the act, Commissioners representing the Government met the various bands and tribes of Chippewa Indians of Minnesota and held councils and reached agreements with them separately. The first of these agreements was executed with the Indians occupying the Red Lake Reservation; next with those occupying the White Earth Reservation, and then with the other bands. Each of these agreements was executed in writing by the Commissioners on behalf of the United States and by Indian signatories on behalf of the several bands or tribes. The agreement with th'e Indians occupying the Red Lake Reservation recited that they had heard, read, and explained the act of Congress approved January 14, 1889, and had accepted and ratified the same, and that they ceded to the United States “ all our right, title, and interest in and to all and so much of said Red Lake Reservation as is not embraced in the following-described boundaries, to wit:” (Here follows a description of the boundaries.) An agreement similar in form was negotiated with the Pembina Band and the agreements with the other Indian bands included the cession of all of their interest in the Red Lake Reservation that was not required and reserved under the provisions of the act of Congress. Two-thirds of all of the Chippewa Indians of Minnesota assented to the agreements executed as described above.
Section 3 of the act of 1889 provided for the taking of a census of the Chippewa Indians of Minnesota and after the taking of the census for making allotments of land in sever-alty to all of said Indians in conformity with the act of February 8, 1887, which specified in detail the amount of land to be allotted to the heads of families, single persons, orphan children, etc., and made other provisions with reference to the allotments not material here. It is insisted c.r the part of plaintiffs that the effect of this provision and ref *470 erence to the act of 1887 was to make the cession and relinquishment contained in the agreement with the Indians of the Red Lake Reservation apply to and cover all of the land of these Indians which was not necessary to make allotments in the manner and to the extent in acres prescribed by the act of 1887. With this contention, which is the foundation of plaintiffs’ case, we are unable to agree for several reasons.
At the outset, in considering the provisions of the act, it is important to keep in mind that the act itself distinguishes between the “ cession and relinquishment ” and the part “ reserved ” and this distinction appears all through its provisions. The cession and relinquishment to the United States was absolute, but it was only the portion included in the “ cession and relinquishment ” which was conveyed to the Government in trust for the benefit of all of the Indians. The effect of the act and agreements was that all of this land ceded by the several bands was “ pooled ”, as the common expression is. The land so ceded was to be sold by the Government and the proceeds used for the benefit of all of the Indians in common, but these provisions have no application to the part reserved. In support of their contention counsel for plaintiffs particularly call attention to the language of the act quoted above which reads: “As to the Red Lake Reservation the cession and relinquishment shall be deemed sufficient if made and assented to in like manner by two-thirds of the male adults of all the Chippewa Indians in Minnesota ”, and argue in effect if not directly that this rendered the agreement signed by the Red Lake Indians not merely an absolute conveyance of the land ceded but a conveyance in trust of all of the land reserved for the benefit of all of the Chippewa Indians of Minnesota in common after allotments had been made in accordance with the act of 1887. It is further contended that this conveyance was. absolute regardless of whether the Red Lake Indians assented thereto or not. We do not need to determine whether the provision last quoted above made the cession absolute even if not agreed to by the Red Lake Indians for it is obvious that the provision with reference to the assent of two-thirds of all the Chippewa Indians of Minnesota applies merely to the “ oes *471 sion and relinquishment ” and has no reference to the reservation. Neither defendant nor intervenor claims that the cession and relinquishment was not absolute. The ultimate question in the case is whether the reservation made in the agreement with the Eed Lake Indians by virtue of the provisions of the act also conveyed the- part reserved.
Congress, however, had no intention of depriving the Eed Lake Indians of their land without their consent. This is made plain by the language of the act which instructed the commissioners “ to negotiate with all the different bands or tribes of Chippewa Indians in the State of Minnesota for the complete cession and relinquishment ”, etc. This clearly implied that the consent of all of the different bands was necessary to put the agreements made with the Indian bands and each of them in force, otherwise no negotiations would be necessary. This feature of the case, however, as we have observed above, is not of importance unless it should be held that not only was the statute of 1889 embodied in the agreement with the Indians but also every provision of the act of 1887 in such a manner as to constitute the agreement a cession not only of the part specifically ceded but of the part reserved less what might be necessary to make allotments in accordance with the act of 1887. We think it clear that the agreement did not so state, but it is contended that by reference and implication it should be so construed although this contention is not harmonious with the other contention that counsel for plaintiffs make, namely, that the commission exceeded its powers in making the reservation specified in the agreement. Examination of the agreement shows clearly that part of the lands of the Eed Lake Indians was ceded and relinquished and part was reserved from the grant. It is true that the part which was reserved was reserved for a certain purpose, and the Congress which passed the act intended or expected sometime it would be carried out, but nevertheless it was reserved and not ceded, and until some further action was taken the rights of the Eed Lake Indians had not been lost or disposed of. In what follows we shall consider more particularly what was said in the agreement with reference to the land reserved.
*472 It is urged on behalf of the plaintiffs that the commissioners exceeded their authority in agreeing to the quantity of land reserved. Even if this were a fact, we think it would be entirely immaterial from any point of view, for the question is not what was the authority of the commissioners but what land was ceded, and think it clear that the Ned Lake Indians did not cede any part of their land which was reserved. Moreover, the agreement was in due course confirmed. But we do not think the commissioners exceeded their authority. The act provided for the cession out of the White Earth and Ned Lake Eeservations of only “ so much of these two reservations as in the judgment of said commission is not required to make and fill the allotments required by this and existing acts.” It will be seen that the amount reserved was left to the judgment of the commission, and if it made an error in judgment it would have no effect upon the agreement which was entered into with the Ned Lake Indians. In this connection it should be noted that while the act of 1887, referred to in the act of 1889, contained a provision with reference to the amount of land to be allotted to the heads of families, single persons, orphans, etc., this was subject to provisions by which the allotments might be increased in size and the Commissioner of Indian Affairs, in giving his instructions to the commissioners, told them that the act provided for the allotment of lands “ advantageous for agricultural and grazing purposes.” The portion reserved contained some timber land and, as the report of the commissioners showed, also a quantity of swamp and untillable land. The commissioners were instructed that it was “ necessary to exercise great care to reserve a sufficient area of land to make the required allotments ”; also that “ the boundaries of the tracts so reserved * * * must be definitely determined and fixed and accurately described so that the Indians * * * [will know] just what and how much land they are parting with by cession and relinquishment to the United States.” (Italics ours.) In our opinion, the Commissioner of Indian Affairs, by this language, correctly construed the act and defined the duties of the commissioners who negotiated the agreement and who did no more than to *473 carry out these instructions. The commissioners afterwards reported, with reference to the portion reserved, that while it was larger than what would eventually be required, it could not be reduced until after survey and allotment. In other words, they were compelled to reserve a larger area of land than would otherwise be necessary in order to make sure that there would be sufficient agricultural and grazing land to make the allotments contemplated by the act.
If the provisions of the act of 1887 had been carried out, no one could determine in advance the location of the allotments because part of the land was timbered and part was neither grazing nor tillable. We need not discuss whether the Government could, notwithstanding the fact that the reserved land had not been ceded, have proceeded later to make the allotments without the consent of the Red Lake Indians thereto, for whatever may have been the purpose of the Congress that enacted the bill of 1889 no allotments were ever made out of the land reserved. On the contrary it was treated as not being subject to allotment.
Finally it should be said that even if we should be mistaken in our construction of the language used in the agreement made with the Red Lake Indians when it is considered by itself and alone, there is, as we think, an all-conclusive answer to the contention of the plaintiffs that the land reserved was in fact conveyed to the Government in trust — allotments to be first made and the remainder sold for the benefit of all of the Chippewa Indians of Minnesota. To say the least that can be said, in favor of the Red Lake Indians, the agreement was ambiguous, and under such circumstances it must be construed as the parties executing it understood its terms. In fact the courts have adopted an even stronger rule in cases where agreements were made with the Indians, and the contract was ambiguous, and that is that it must be construed as the Indians understood it.
Proceeding next to a consideration of what the Indians understood at the time the agreement was negotiated, it must be said with reference to the committee report upon which the plaintiffs place some reliance that the Indians knew precisely nothing, for it was not mentioned to them. Nor did *474 tbey know any more about the act of Congress than what they were told by the commissioners, and this was exactly contrary to the statements made in the committee report upon which the plaintiffs rely. The evidence with reference to the negotiations with the Indians which resulted in the agreement which we have been discussing may be summarized as follows:
Pursuant to the act of January 14, 1889, the President appointed H. M. Eice, Et. Eev. Martin Marty, and Joseph B. Whiting as commissioners to negotiate an agreement with the several bands of the Chippewa Indians of Minnesota. The commissioners first went to the Indians occupying and belonging to the Eed Lake Indian Eeservation and held a series of councils with them from June 29 to July 6, 1889. The commissioners made a report setting out the “ minutes of the council proceedings.” Extracts from these minutes are set out in finding XIV and it is not necessary to restate here what was said by the commissioners and the representatives of the Indians at these councils. It is sufficient to say that the commissioners gave the Indians of the Eed Lake Eeservation to understand that they were the sole owners of their reservation, and that no other Indians had any interest therein; also that a boundary line was laid out for the part which these Indians ceded, and that under the agreement signed the remainder was to be kept for their benefit in perpetuity. It is true that the minutes state that the act was read and translated and the agreement signed by the Indians stated that it was fully explained, but the minutes show that from the explanation the Eed Lake Indians must have understood that no other Indians had acquired or were to have any interest in the portion reserved by the agreement, and that the title of the land which was reserved after the proposed cession would be fixed and settled in the Eed Lake Band. We do not understand that this is seriously controverted by' counsel for plaintiffs. Their contention is that none of the statements made by the negotiators or the Eed Lake Indians in the course of the negotiations are competent 'evidence, but we think the agreement of the Indians must be construed in the light of what was said to them at the time. The question *475 now before the court is not whether the Red Lake Indians understood that the land reserved might be allotted subsequently, but whether they made any cession or conveyance to the Government of the land reserved which caused their rights to pass to other Indians. Counsel for plaintiffs cite the case of United States v. Minnesota, 270 U. S. 181, as showing that the statements made by the commissioners to the Red Lake Indians cannot be considered in determining the limits of the cession made by them. In this case it was held that a treaty cannot be annulled by the courts, and citing United States v. Brooks, 10 How. 442, where a grant was assailed as induced by fraud practiced on the Indians, the court said that such a matter could not be made the subject of judicial inquiry. But here there is no attempt to annul the agreement made by the Red Lake Indians nor any claim of fraud practiced upon them in the negotiations which led up to it. The question before the court is how the agreement which was made with them must be construed and both the defendant and the intervenor contend that it cannot properly be construed to convey the lands which were reserved in the agreement with the Red Lake Indians. On this point we think that both reason and authority concur in holding that what was told the Indians at the time the negotiations were in progress is material and controlling.
In the case of Choctaw Nation v. United States, 119 U. S. 1, the court approved the doctrine laid down in the case of United States v. Kagama, 118 U. S. 375, 383, saying that the Indian tribes are the wards of the Nation and from their weakness and helplessness there arose the duty of protection and with it the power, and that this principle had always been recognized by the Executive, Congress, and this (the Supreme) Court. The court also approved an extract from the case of Worcester v. Georgia, 6 Pet. 515, 582, as follows:
“ The language used in treaties with the Indians should never be construed to their prejudice. If words be made use of which are susceptible of a more extended meaning than their plain import, as connected with the tenor of the treaty, they should be considered as used only in the latter sense. * * * How the words of the treaty were understood by this unlettered people, rather than their critical meaning, should form the rule of construction.”
*476 In United States v. Winans, 198 U. S. 371, this language was affirmed.
In Jones v. Meehan, 175 U. S. 1, it was said that a treaty between the United States and an Indian tribe must be construed not according to the technical meaning of its words to learned lawyers but in the sense in which it would naturally be understood by the Indians. The decision in this case is particularly applicable to the one at bar.
When learned lawyers dispute as to the proper construction of the act of 1889, we can hardly expect that the “ unlettered ” Red Lake Indians would understand it, even when it was interpreted to them. True the agreement recited that the act was explained to them, but the evidence shows that the commissioners who represented the Government explained to the Indians that it did not affect their ownership in the part not ceded, and that the Indians signed the agreement only when this assurance had been repeatedly made to them. If there were nothing more, we think it should be held that the lands reserved in the agreement of 1889 made by the Red Lake Indians were not ceded to the Government.
There is another feature which we think tends strongly to confirm the title of the Red Labe Indians as well as our construction of the act of 1889 and the agreement made thereunder.
Both the Government and the Red Lake Indians, after the agreement of 1889, always placed the construction upon it for which these Indians now contend, and such construction was followed by all parties who had anything to do with its being carried out. A long list of decisions by the Supreme Court could be cited, holding that the construction which has been placed upon the contract by the parties who entered into it must prevail where the contract is ambiguous, and it has even been said that it is the best evidence of the intention of the parties. In the case of District of Columbia v. Gallaher, 124 U. S. 505, the Supreme Court said that the practical construction which parties put on the terms of their own contract must prevail even over the literal meaning of the contract, and this decision was followed in the case of Marietta Mfg. Co. v. United States, 73 C. Cls. 528, 547.
*477 We have heretofore stated that no one down to the time that this claim was brought before Congress and the act which gives this court jurisdiction of the claim in suit was passed had ever denied or even questioned the title of the Eed Lake Indians, except in the committee report which has been hereinbefore mentioned. When negotiations were entered into with other Chippewa Indian bands no one put such a construction upon the act as is now claimed by plaintiffs. In their council with the Indians belonging to the White Earth Reservation they told them that what was reserved of the Red Lake Reservation was reserved for the Red Lake Indians alone, and thereupon one of the chiefs said, in effect, that otherwise he would not sign the agreement ; that he had no right to cede any of the Red Lake lands; and the commissioners stated that to avoid complications they had concluded to go to Red Lake first, and if they did not succeed there would hold no other councils.
After the passage of the act of 1889 and the execution of the agreement of 1889 with the Red Lake Chippewas, the Government officials continued to treat the Red Lake Indians as sole owners of their reservation as delimited by this agreement. The only exception, if it can be called an exception, is found in a report of the Secretary of the Interior, made January 80,1890, in which, after referring to the statement made by the commissioners explaining in part why so large an amount of land had been reserved, the Secretary said:
“ Whether the surplus lands that may remain after allotments shall have been completed as required by the law can be disposed of without further legislation is a question which will require consideration, but such consideration is not necessary at this time.”
This statement, which merely showed some doubt in the mind of the Secretary as to the construction of the act of 1889 and the agreement made thereunder, can have no bearing on the question as to what the Indians understood to be the effect of the agreement but merely shows that he was not fully informed on the subject at that time. Later proceedings, to which attention will next be called, showed that *478 neither the Secretary of the Interior nor the Indian Bureau considered that the Bed Lake Indians had parted with their title to the land reserved in the agreement made with them.
On November 21, 1892, following a statement from the Secretary of the Interior showing what the Bed Lake Indians understood to be their diminished reservation under the agreement of 1889, the President issued an Executive order withdrawing certain tracts of land in the State of Minnesota from settlement and added these tracts to the Bed Lake Indian Beservation for the benefit and use of the Indians thereof, and said lands have ever since been so held.
The communication from the Secretary of the Interior stated, among other things, that a letter which had been received from the chairman of the Chippewa Commission which had negotiated the agreement with the Bed Lake Indians showed that the boundary as marked by a map used by the Commission was not in accordance with the understanding of the Bed Lake Indians, and it was accordingly recommended that sufficient of the land heretofore open to settlement be withdrawn and added to the diminished Bed Lake Beservation. The President, following this recommendation, ordered that the lands described in the communication be “ added to the Bed Lake Indian Beservation, as a part of the same for the use and benefit of the Indians thereof.” Ever since that date the area described in an agreement with the Bed Lake and Pembina Indians, together with the addition made thereto by Presidential order, has been treated and held by defendant as a reservation belonging to these Indians and no allotments in severalty have been made on the diminished Bed Lake Beservation as thus delimited. It is obvious that this order of the President is entirely inconsistent with any idea that the Bed Lake Beservation did not belong solely to the Bed Lake Indians which occupied it.
The provisions of the act of 1889 with reference to making allotments to the Indians in severalty were never carried out with reference to the Bed Lake Beservation. The reasons for not making the allotments are stated by the Commissioner of Indian Affairs in .a letter dated May 9, 1896, in which he said, among other things, that at the time of the negotiations *479 under tbe act of January 14, 1889, the Red Lake Chippewas were opposed to allotments in severalty and that a diminished reservation with definite boundaries was set aside by the agreement for the occupancy of the Red Lake Indians. The letter further recited other reasons why it was not advisable to attempt to allot the lands of the Red Lake Indians and recommended a postponement of the matter. The Secretary of the Interior concurred in this view and instructed the commission to make no allotments to the Red Lake Indians “ at present.” The Department, however, proceeded to make allotments of land outside of the Red Lake Reservation.
The Government thereafter proceeded to negotiate and treat with the Indians on the Red Lake Reservation on the basis that they were the owners of the Indian title thereto. In 1901 the Secretary of the Interior was authorized by act of Congress to negotiate agreements with the Indians for the cession of portions of their respective reservations or surplus unallotted lands, any agreements thus negotiated to be subject to subsequent ratification by Congress. Under this act the Secretary of ,the Interior in 1902 designated James McLaughlin to negotiate with the Red Lake and Pembina Indians for the cession of the western portion of the Red Lake Reservation as it then existed. McLaughlin accordingly negotiated an inchoate agreement with the Red Lake Indians. In the course of the negotiations and the discussion in relation to the matter with the Indians, the Indians again protested against the allotment of their land and said it was their understanding that there was to be no allotment. McLaughlin told them that this was a matter in which they alone had any interest, that if they made the cession which he proposed all of the proceeds would go entirely to the Indians of the Red Lake Reservation, and that there would be nothing in the agreement requiring them to take any allotments. In consideration of their making the cession he offered the Indians a million dollars. The Indians accepted this, stating in substance that it was with the understanding that they were not to be required to make any allotments, that this agreement was to be final, and that their “ diminished reservation must remain intact for all time.” This agreement, *480 which provided for the cession of about 256,152 acres of the Eed Lake Eeservation, was not ratified by Congress, which, however, passed an act authorizing the Secretary of the Interior to sell the part of the Eed Lake Indian Eeservation which lay within certain boundaries, the proceeds thereof to be paid to the United States Treasury to the credit of the Indians belonging on the said reservation. The act contained a proviso that it should not take effect until after it was ratified in a certain manner by the Eed Lake and Pembina Bands of the Chippewa Indians belonging on the Eed Lake Indian Eeservation. Subsequently the Eed Lake Chippewas declined to accept the provisions of this act. Congress thereupon passed the act of February 20, 1904, which referred to the agreement which McLaughlin had made with the Eed Lake and Pembina Bands and recited the agreement which he had made with them for the cession of approximately 256,152 acres, the payment therefor to be a million dollars. Further, after reciting that it was for the best interests of the Indians of the Eed Lake Eeservation that this agreement should be modified, it prescribed the amendments thereto, and under a new agreement to be executed the Indians then residing on the tracts ceded by it, were to be removed to the diminished reservation and paid by the Indians of the Eed Lake Eeservation out of the first payment received by them from the proceeds of this cession. The act further provided for the sale of lands ceded and for the payment to the Eed Lake Indians of the proceeds thereof under certain terms and conditions. Article IV of the new agreement, for which provision was made, recited: “Article IV. It is further agreed that the said Indians belonging on said Eed Lake Indian Eeservation, Minnesota, shall possess their diminished reservation independent of all other bands of the Chippewa Tribe of Indians and shall be entitled to allotments thereon * * * ”; and also Article V, which read as follows: “Article Y. It is understood that nothing in this agreement shall be construed to deprive the said Indians belonging on the Eed Lake Indian Eeservation, Minnesota, of any benefits to which they are entitled under existing treaties or agreements not inconsistent with the provisions of this agreement.”
*481 By article IV it was agreed that the Bed Lake Indians should possess their reservation independent of all of the other Chippewa Bands. It is quite apparent that Congress in passing the act of 1904, providing for the agreement which was entered into under it, did not understand it was depriving any other Indians of any rights in the Bed Lake Beser-vation, or, in other words, when the act was passed and the agreement entered into, it was clearly understood that no other Indians had any rights therein. This is made clear by the repeated declarations of the Government through its officials and the provisions of the act under which the other Indians were to be paid nothing. Counsel for defendant insist that article IV constituted a recognition of an outstanding claim. On the contrary, when we consider the situation and the negotiations which led to the agreement it becomes very plain why this provision was inserted in the agreement. The Bed Lake Indians had heretofore ceded a very large body of land to the Government and it was explicitly understood at th'e time the cession was made that the diminished reservation should be theirs alone. Now they were called upon to make an additional cession, and what was said at the time of the negotiations shows that the Indians wanted this to be final and the last time they should be called upon to make any cessions. As one of their chiefs said: “We want this agreement so that the mice cannot break into it, as they have to the other agreements. Our diminished reservation must remain intact for all time.” (Italics ours.) '
They succeeded in getting inserted in the agreement an express provision which so declared, and by article V this declaration was in effect reiterated and amplified by stating that the agreement should not be construed to deprive the Bed Lake Indians “ of any benefits to which they are entitled under existing treaties or agreements not inconsistent with the provisions of this agreement.” Aside from the two provisions quoted, it is difficult to see how Congress could make a stronger declaration of the fact that the Bed Lake Indians owned their reservation exclusively than by providing for and approving an agreement with these Indians whereby they alone executed a conveyance of a very large portion of the *482 reservation and further provided that these Indians alone should receive payment for the land so conveyed. This was in effect a declaration that no other Indians had any interest therein.
In the same manner Congress recognized the sole right of the Ned Lake Indians to their reservation by passing a number of acts relating to this reservation and the proceeds of the sale of lands therefrom subsequent to the act of 1889. Although the court would take judicial notice of these acts, for convenience we have set out in finding XXXIY a summary of their provisions so far as they have any bearing on the case before us. In the same finding is a list of numerous other congressional acts which recognized that the trust created by the cession of lands from the Ned Lake Indian Eeservation was solely for the benefit of the Ned Lake Indians. This action of Congress, we think, tends to confirm the conclusions which we have above set forth.
In the opinion of the Supreme Court in Fairbanks v. United States, 228 U. S. 215, 222, 225, the Supreme Court construed together the Steenerson Act, the Nelson Act (as the act of 1889 is sometimes called), the General Allotment Act and its amendment of 1891, as they affected allotments on the diminished White Earth Eeservation. It will be remembered that the White Earth and Eed Lake Eeservations stood on the same footing with reference to cession and relinquishment under section 1 of the Nelson Act. It would unduly extend this opinion to quote from and analyze the opinion rendered in that case. It can only be said that we think that on the whole it sustains the contention of the defendant. Plaintiffs seek to avoid this construction by asserting that this and the case of Leecy v. United States, 190 Fed. 289, pertain to allotment cases, which is true; but it became necessary to determine what land was reserved for allotments, which the court held to be the diminished reservation and also that section 4 of the Nelson Act applied only to the lands which were ceded. With reference to the Steenerson Act, the Supreme Court said that it modified and changed the prior acts of Congress by superseding certain of their provisions and enlarging the quantity of land to be alloted.
*483 Counsel for plaintiffs seem to rely on the case of Minnesota v. Hitchcock, 185 U. S. 373, although they do not attempt to construe the language of the decision. In that case, referring to the agreements made by the Ned Lake Indians under the act of 1889, the court said with reference to the cession: “ It was a cession of all of the unallotted lands ”, and also, in another paragraph, “ The cession was, as we have seen, of all the unallotted lands, and the cession was of those lands ‘ for the purposes and upon the terms hereinafter stated. ” But we are clearly of the opinion that this language cannot be so construed as to utterly disregard the terms of the act and the agreement which was entered into with the Indians. The act and the agreements pertained to all of the land which the several bands of Chippewa Indians occupied. All of this land was “ unallotted ”, and, as we have shown, the Red Lake and White Earth Bands did not cede all of their lands to the Government but reserved a part thereof. If the words, “ the cession was of all of the un-allotted lands ”, are given a literal construction they do not accord with the language used by the court in its statement of the case which precedes the opinion. This statement very clearly preserved the distinction between the part ceded by the Red Lake Indians and the part reserved and stated (page 378) how the ceded lands were to be disposed of. Further on in the statement (page 379) it is said:
■“ Under this act a Commission was appointed and an agreement made with the Indians for a cession of a large part of the Red Lake Indian Reservation, which agreement was approved by the President, March 4, 1890, the tmceded 'portion being reserved by the Commissioners ‘ for the purpose of making and filling the allotments provided for in the act.” (Italics ours.)
We think the court by the words “ unallotted lands ” intended to refer to the lands not reserved for allotment, for this was the part of the Red Lake Reservation which was ceded. In any event, the court had no occasion to pass on the question upon which the case now pending before us turns, which was not involved in the case of Minnesota v. Hitchock, and to give such a meaning to the language relied upon by plaintiffs would make it mere obiter Meta.
*484 It should also be noted that the words “ it was a cession of all of the unallotted lands ” follow the sentence “ the cession was not to the United States absolutely, but in trust.” If the meaning contended for by plaintiffs be given to the second sentence it is another instance where the opinion is made inharmonious. The trust pertained only to the ceded lands, that is the lands not reserved, and they were ceded, as stated in the act, “ for the purposes and upon the terms hereinafter stated ”, that is to be sold and the proceeds divided among all the Chippewa Indians. The Supreme Court calls attention to this as applying only to the ceded land, on page 318 of its statement of the case, and quotes at length from section 1 of the act with reference to the disposition of the proceeds of the ceded land. The Government was not bound to make allotments to the Red Lake Indians and had it done so it would have made them over the continued protests of this band which had objected thereto from the start. We do not think the case of Minnesota v. Hitchcock, supra, supports the plaintiffs’ case.
In the case of Fairbanks v. United States, supra, the Supreme Court expressly negatives the construction which counsel for plaintiffs wish to put upon the decision in Minnesota v. Hitchcock, supra, saying:
“ Section 1 of the Nelson Act provides for the negotiation with the Chippewas ‘ for the cession and relinquishment ’ of their title to their reservations, ‘ except White Earth and Red Lake, and to all of those two which may not be required to fill the allotments required by this and existing aots.’ (Italics ours.) The land reserved for allotments is the diminished reservation, to which we shall presently refer, and section 3 provides for its allotment.”
The case of United States v. Mille Lac Band, 229 U. S. 498, is cited by plaintiffs, but when the opinion is analyzed we do not think it supports plaintiffs’ position. In that case as well as in Minnesota v. Hitchcock, supra, the issue involved was not the same as in the case before us. In neither of these cases was there any issue as to whether the so-called “ surplus lands ” were transferred to the Government in trust, and if anything was said that might bear thereon it was clearly obiter dicta. The principal issue in the Mille Lac case, supra, *485 was the construction of a proviso contained in section 6 of the act of 1889 as to which no question is raised in the instant case. The court said this section was plain and unambiguous and should not be given a construction that would make it a mere nullity. With reference to the act in general the court quoted the language used in Minnesota v. Hitchcock, supra, that “ it was a cession of all of the unalloted lands ”, evidently meaning as we have before explained in relation to the last-named case the lands “ not reserved ” for allotment as was later held in Fairbanks case, supra.
Our construction of the language of the act as stated above is, however, not necessary to a determination of the case; for, as we have shown, the agreement with the Eed Lake Indians must be construed as the Indians had reason to understand it from the language of the negotiators and as they did understand it. The agreement and not the act must control when we determine what land was ceded.
Plaintiffs also contend that there is a large tract of land which was ceded by the agreement of 1889 for trust purposes, as provided therein, which has since been turned over to the Eed Lake Indians without consideration and that the defendant is chargeable with the value of this tract. The facts upon which this claim is based are as follows:
We have already seen that after protracted negotiations the commissioners and the Eed Lake Indians reached an agreement upon the areas to be ceded and to be reserved. For the purpose of determining the boundaries they used the current Eand-McNally map, which was the only guide they had at that time, and marked thereon the diminished reservation believing this map to be correct. Later official maps proved that the map which they used was incorrect, in that the lower Eed Lake extended farther to the eastward than was shown thereon. Being misled by this erroneous map, the parties contrary to the intention of both, made a mutual mistake in agréeing upon a line which left a portion of the shore of lower Eed Lake out of the reserved area. Later it was discovered that all of the lands which the commissioners and the Indians intended to include within the reserved area for the purposes of allotment had not in fact been included by reason of this mistake. The intention of the commissioners *486 and the Indians was made known to the Commissioner of Indian Affairs by Nice, the former chairman of the commission, who recommended that the mutual mistake be corrected by restoring certain lands to the Ned Lake Neservation. The Commissioner and the Secretary of the Interior both concurred, and in accordance with the Secretary’s recommendation the President issued an Executive order on November 21,1892, and restored to the Ned Lake Neservation the lands designated by the Secretary. These lands have ever since remained a part of the Ned Lake Neservation. Counsel for plaintiffs contend that there was no statutory or other authority for the correction of this mistake by Executive order and that as to these lands there can be no question as to the right of plaintiffs to recover. On the contrary, we think that if it was not the intention of either party that these lands should be ceded and they were subsequently relinquished, whether formally or informally, by the Government to the Ned Lake Indians, the right of these Indians to the lands so relinquished was complete. The agreement was made with the Government. The Government concedes that the cession of these lands was by mistake and has undertaken to rectify the mistake, possibly in an irregular manner, but at all events the right of the Ned Lake Indians to this land has been recognized by the Government, they are still in possession of it, and the mistake did not deprive them of their rights or give the Government any valid title thereto.
No claim based on the equities of the case can be fairly made by plaintiffs. It is .true that the number of Ned Lake Indians is small compared to the number of all of the other Chippewa Indians of Minnesota and that they originally occupied a very much larger tract of land than any of the other bands, but as shown by the report of the Secretary of the Interior dated July 31, 1922, “ of the 3,669,200.96 acres ceded [in 1889] for the common benefit of all the Chippewas of Minnesota, the Ned Lake Bands contributed 2,905,921.28 acres, or practically two-thirds of the entire ceded areas.” The table showing the amount ceded by each band is found in finding XXIII. This shows that when the cessions of any of the other bands are considered alone the amount ceded *487 was comparatively small. In 1904 the Bed Lake Band ceded 256,152 acres more land to the United States. Altogether, if we considered the first cession made about 1863, they ceded about 11,000,000 acres of land. They now occupy about 400,000 acres. On a portion of the tract ceded in 1889 there was a dense growth of pine and other valuable timber. Of their present holdings, 35,939 acres are entirely valueless, and in 1904 the whole tract was worth only $1.30 per acre, which shows that much of the remainder was of very poor quality.
The conclusions that we have reached and stated above make it unnecessary for us to proceed any farther with the case. The plaintiffs’ petition must be dismissed, and it is so ordered.
Whaley, Judge; Williams, Judge; Littleton,- Judge-; and Booth, Chief Justice, concur.
MEMORANDUM ON PLAINTIEFS’ MOTION POE NEW TRIAL
Complaint is made in the motion for new trial that the court omitted to set out in full in the findings certain statutes, treaties, and agreements made in writing by the Government of the United States with the Indians. While matters of this kind for convenience have been set out in findings this court and the Supreme Court take judicial notice thereof without their being so included.
Although the court does not consider it material to the case,- on plaintiffs’ request the findings will be amended to show that without including any of the Bed Lake or Pembina Bands more than two-thirds of all of the Chippewa Indians of Minnesota consented to the provisions of the agreements made with reference to the Bed Lake Beservation.
Plaintiffs also complain because the findings do not set out an itemized account which shows the nature of the expenditures referred to in findings XXXYII and XXXVIII. By oversight the total of the amount of expenditures specified in finding XXXVII was made $74,991.99 too large and this finding will be corrected accordingly. The court, however, did not decide that any item or items of expenditure made by the Government were proper offsets under the bill which *488 gave this court jurisdiction of the case. At the present stage of the proceedings there is no occasion to list these items separately in the findings.
Other than specified above, the motion for new trial must be overruled.