Booth, Chief Justice,
delivered the opinion of the court:
A special jurisdictional act confers jurisdiction upon this court to adjudicate and determine the issues in this case. Plaintiff’s petition was timely filed under the act and defendant has filed a demurrer thereto. The jurisdictional act provides in part as follows:
That nothing herein contained shall be construed to create any obligation not heretofore existing in law or equity against the United States in its governmental capacity or as trustee for the individual Indians receiving the benefit of such services and/or expenses: Provided, further, That the jurisdiction hereby conferred shall be limited to claims for services rendered and expenses incurred on behalf only of such Indian or Indians as were enrolled as citizens, of the Choctaw Nation under the provisions of the Choctaw-Chickasaw sup-plemental agreement approved by the Act of July 1, 1902, and ratified by the Choctaws and Chickasaws on *81 September 25, 1902 (32 Stat. 641, 651-652),. and the provisions of this Act shall not be construed as authorizing the consideration or adjudication of any claim for services rendered and expenses incurred on behalf of any person not so enrolled (48 Stat. 1467).
The pertinent allegations of the petition begin with a statement embracing the controversy over the right of Mississippi Choctaw Indians to be enrolled upon the rolls of the Choctaw Nation and thereby acquire equal rights with the members of the Choctaw Nation in the common property of the same. The above controversy originated from Article XIV of the treaty of September 27, 1830 (7- Stat. 333), which provided that those members of the Choctaw tribe who remained in Mississippi after the tribe removed to the West “shall not lose the privilege ■ of a Choctaw citizen, but if they ever remove are not to be entitled to any portion of the Choctaw annuity.”
A considerable number of Choctaws remained in Mississippi and were entitled to remain under provisions of the treaty of 1830. Opposition to the enrollment of Mississippi Choctaws on the rolls of the Choctaw Nation did not become an issue until, as the petition states, the United States determined upon the policy of allotting and distributing in severalty to the Choctaws of Oklahoma their landed and personal estate. The act of July 1, 1902 (32 Stat. 641), granted the right to Mississippi Choctaws to become enrolled members of the Choctaw Nation in the West upon certain conditions, among them the following as disclosed by Paragraphs 41 and 42 of the statute:
41. All persons duly identified by the Commission to the Five Civilized Tribes under the provisions of section 21 of the act of Congress approved June 28, 1898 (30 Stat. 495), as Mississippi Choctaws entitled to benefits under article 14 of the treaty between the United States and the Choctaw Nation concluded September 27, 1830, may, at any time within six months after the date of their identification as Mississippi Choctaws by the said Commission, make bona fide settlement within the Choctaw-Chickasaw country, and upon proof of such settlement to such Commission within one year after the date of their said identification as Mississippi Choctaws shall be enrolled by such Commission as Mis *82 sissippi Choctaws entitled to allotment as herein provided for citizens of the tribe, subject to the special provisions herein provided as to Mississippi Choctaws, and said enrollment shall be final when approved by the Secretary of the Interior. The application of no person for identification as a Mississippi Choctaw shall be received by said Commission after six months subsequent to the date of the final ratification of this agreement * * * all of said Mississippi Choctaws so enrolled by said Commission shall be upon a separate roll.
42. When any such Mississippi Choctaw shall have in good faith continuously resided upon the lands of the Choctaw and Chickasaw nations for a period of three years, including his residence thereon before and after such enrollment, he shall, upon due proof of such continuous, bona fide residence, made in such manner and before such officer as may be designated by the Secretary of the Interior, receive a patent for Ids allotment, as provided in the Atoka agreement, and he shall hold the lands allotted to him as provided in this agreement for citizens of the Choctaw and Chickasaw nations.
The removal and continuous residence conditions of the act of 1902, coupled with the necessity of sufficient proof to warrant identification of a Mississippi Choctaw, brought about the employment of persons to represent them and secure their rights under the statutes enacted for their benefit. The petition alleges that the Mississippi Choctaws were poor, many of them illiterate, unable to speak English, and incapable of removing of their own accord to the West and thereby meeting the conditions for enrollment.
The petition further alleges that at the time of required removal the valuable lands in the Choctaw Nation West were legally held by the owners of improvements made thereon, and for a Mississippi Choctaw to obtain an allotment of any of said lands it was necessary for the allottee to purchase the improvements of the owner of the same, and in consequence of their impoverished condition it was well known to the United States that Mississippi Choctaw applicants were unable to acquire the benefit of the act of 1902 without the assistance of the United ‘ States, ah assistance which the United States had always given tribal *83 Indians, and the failure to provide for the expenses incident to removal and residence on the lands, when provided by a third party, creates an implied obligation upon the part of the United States to reimburse said party for sums expended.
Plaintiff’s decedent, David C. McCalib, lived in the Choctaw Nation from 1903 to 1907. W. H. Gallaspy was a resident of Mississippi and it was he who brought to Oklahoma eighty-seven (87) Mississippi Choctaw Indians, comprising thirteen families, clients of Gallaspy under individual contracts to represent them before the Dawes Commission in Mississippi in their efforts to be identified and enrolled upon the Choctaw Nation rolls. Gallaspy’s contracts of employment were taken upon a contingent fee basis, with the added consideration of reimbursement for expenses incurred.
Gallaspy, the petition states, for the first time became aware that the Mississippi Indians he had transported to Oklahoma could not make selections of allotments upon improved lands without first purchasing the improvements thereon, and could not procure a patent to an allotment until after a continuous residence thereon for three years, when he arrived with his clients in Oklahoma. These conditions, coupled with the Indians’ financial status, presented to Gal-laspy and the Indians the necessity of Gallaspy’s returning them to Mississippi or concluding some arrangements for their remaining in Oklahoma and not losing the rights granted by the act of 1902.
Gallaspy, it is said, “made an arrangement” with McCalib to take over Gallaspy’s obligations to the Indians, McCalib to pay Gallaspy $8,000 for service rendered and expenses incurred, McCalib thereafter to proceed under Gallaspy’s contracts as assignee of the same, a transaction completed by the parties in every respect. McCalib paid Gallaspy the $8,000 and received a complete assignment of the contracts mentioned.
McCalib, it is alleged, secured allotments for said Indians, furnished supplies, stock, equipment, and maintained and cared for them for three years which enabled them to receive a patent for their lands, and it is also alleged that *84 they are now enjoying all the privileges of citizenship in the Choctaw Nation, an individual right of at least the appraised value of $8,500.
Plaintiff seeks a judgment for the total sum of $68,451.89— $30,000 value of services rendered, $8,000 reimbursement for sum paid by McCalib to Gallaspy, and $30,451.89, money actually expended in caring for and maintaining the Indians until allotted and thereafter until patents to their allotments were granted.
The language of the special jurisdictional act is significant. The United States does not waive any defenses to the cause of action; on the contrary, it expressly reserves the same. The plaintiff does not argue to the contrary. Therefore, the issue narrows to the single question, i. e., Is the United States liable under the facts alleged because of the usual common law liability governing the relationship of a guardian and ward?
The plaintiff asserts that the United States has consistently recognized as a governmental duty its obligation to bear the expense of the removal of tribal Indians from the East to the West. Early Indian treaties involving the removal of a tribe of Indians did provide for the payment of the expense of so doing. This obligation was assumed as a part of the consideration for the surrender to the United States of valuable Indian lands by the tribe. It was manifestly a fair and just one; whether it was induced wholly from a sense of duty or included within the scope of a governmental policy to procure the removal of the tribe from the East to the West, likewise regarded as a governmental duty, is difficult of ascertainment.
However, we do not have that particular question here. What confronts the court is granting arguendo the existence of the governmental duty claimed, may a third party intervene, discharge that duty, and recover from the Government the expense incurred in performing a duty the Government should have performed ? The plaintiff frankly concedes in the brief “that claims may not be predicated upon defaults of the United States in the exercise of a governmental function.” We think the existence of a remedy for failure to recognize a governmental duty which occasions injury is exclusively dependent upon legislative dis *85 cretion, and no court may intervene save by an act of Congress.
It is true, as evidenced by repeated decisions of the Supreme Court — familiar ones — that the relationship of the United States to tribal Indians has been held to resemble that of a guardian to his ward. In the construction of Indian treaties and acts of Congress involving Indian tribes, and the disparity between the parties due to difference in intellectual attainments, as well as financial status and dependency upon the Government, the courts have uniformly resolved all doubts in favor of the tribe, but we are cited no decision, and none, we think, exists which extends to the limit of holding that in the absence of a treaty or act of Congress the Government because of such relationship is liable for the payment of money under contracts made between individual Indians and a person engaged to represent them.
The Government’s jurisdiction over Indian tribal affairs, including their landed and monetary estate, is plenary and exclusive. It is for Congress and Congress alone to determine how their lands shall be held or divided, and how their tribal Indian funds shall be apportioned among them. Lone Wolf v. Hitchcock, 181 U. S. 553, Heckman v. United States, 224 U. S. 413.
Individual citizens dealing with an Indian tribe or members of the same do so with full knowledge of the relationship of the tribe and the Government, and it is clear, we think, beyond the peradventure of a doubt, that in no instance is the Government liable for any indebtedness incurred by either the tribe or members of the same unless by a treaty or act of Congress such a liability has been assumed. The fact that Congress has heretofore by legislation assumed liability of a character similar to the one in suit in no way fortifies plaintiff’s position. On the contrary, it emphasizes the fact that an act of Congress is an indispensable prerequisite to the maintenance of the same.
The United States can not become liable upon a contract made by an individual Indian with a third party in the absence of granted authority to make such a contract. The Supreme Court had this precise question before it in the *86 case of United States v. McDougall's Administrator, 121 U. S. 89, 98, 101. With respect to this issue the court said:
That Congress, by special acts, made provision for the payment of particular claims of the same class furnishes no ground whatever for the assumption that the government recognized its legal liability for the amount of such claims, much less for the amount of. all other claims of like character. Such legislation may well furnish the basis for an appeal to the legislative department of the government to place all claimants, of the same class, upon an equality. But we are aware of no principle of law that would justify a court in treating the allowance by Congress of particular claims as a recognition by the Government of its liability upon every demand of like character in the hands of claimants. We may properly take judicial notice of the fact that many claims against the United States cannot be enforced by suit, the provision for which may, and upon grounds of equity and justice ought to be, made by special legislation. But the discretion which Congress has in such matters would be very seriously trammelled, if the doctrine should be established, that it cannot appropriate money to pay partciular claims, except at the risk of* thereby recognizing the legal liability of the United States for the amount of other claims of the same general class. * * * That the policy pursued by Wozencraft and his colleagues was the only one that would have given peace to the inhabitants of California; that the Indians were induced by the promises of subsistence held out to them to abandon their lands to the whites., and settle upon reservations selected for them; and that the United States thereby acquired title to the lands so abandoned, are considerations to be addressed to Congress in support of a special appropriation to pay the claim of McDougall’s administrator. They do not, in our judgment, establish or tend to establish a claim against the United States enforcible by suit.
If Congress intended to create a liability when the special jurisdictional act was passed, the necessity of referring the case to this court would not have existed. The special act reflects the fact that Congress referred to this court the legal issue as to whether either in law or equity an obligation to pay the amount sued for obtained, and the plaintiff’s insistence is predicated upon what Congress has *87 heretofore done with respect to paying the expenses incurred in removing tribal Indians from the East to the West.
A review of cases involving tribal Indians discloses without exception that governmental liability for acts of the Government in the conduct of Indian affairs arises only from acts of Congress or treaties with the tribe. The special jurisdictional act in the Winton case, 51 C. Cls. 284, 296; 255 U. S. 373, unlike the act in this case, provided in part as follows:
That the Court of Claims is hereby authorized and directed to hear, consider, and adjudicate the claims against the Mississippi Choctaws of the estate of Charles F. Winton, deceased, his associates and assigns, for services rendered and expenses incurred in the matter of the claim of the Mississippi Choctaws to citizenship in the Choctaw Nation, and to render judgment thereon on the principle of quantum meruit in such amount or amounts as may appear equitable or justly due therefor, which judgment, if any, shall be paid from funds now or hereafter due such Choctaws by the United States.
The distinction between the two acts with respect to the court’s jurisdiction thereunder is obvious. The act in the Winton case is a direct charge against Indian tribal funds. The act in this case creates no predetermined liability.
The plaintiff’s contracts created individual obligations, and at the time they were entered into neither party to the same contemplated governmental liability to pay the prescribed fee. If the allottee received his share of land and funds, the plaintiff was to receive his compensation therefrom; if he failed of enrollment his representative was to receive no compensation at all, a speculative transaction embracing an assumed risk both with respect to realizing a fee and recovering the same in the event of his client’s enrollment, made under the manifest impression that the parties thereto were or would become in all respects sui ju/ris.
Congress on March 3, 1903 (32 Stat. 982, 997), enacted an act which reads in part as follows:
That the sum of tiventy thousand dollars, or so much thereof as is necessary, is hereby appropriated, to be *88 immediately available, for the purpose of aiding indigent and identified full-blood Mississippi Choctaws to remove to the Indian Territory, to be expended at the discretion and under the direction of the Secretary of the Interior.
Subsequent to the passage of this act a controversy arose as to whether any portion of the sum appropriated could be used to subsist a Mississippi .Choctaw after reaching Oklahoma. It was finally determined that the fund was available for such a purpose. A number of Mississippi Choctaws were removed by the Commission acting under this statute. We can not hold that the above appropriation, even if insufficient to accomplish its purpose, was made in response to a legal obligation to bear the expenses of removal and subsistence as claimed.
Congress by the enactment of laws gave to the Mississippi Choctaws the rights they obtained. The question of paying for the removal and subsistence of those who might obtain such rights was, like the creation of the rights, one for Congress and Congress alone. With the moral obligations incident to the transaction both parties concede we have nothing to do.
Defendant’s demurrer is sustained and the petition is dismissed. It is so ordered.
Whaley, Judge; Williams, Judge; LittletoN, Judge; and GREEN, Judge, concur.