**MINNESOTA CHIPPEWA TRIBE et al.**
**v.**
**The UNITED STATES.**
**No. 11–61.**

United States Court of Claims.
April 5, 1963.

Marvin J. Sonosky, Washington, D. C., for appellants. Jay H. Hoag, Duluth, Minn., and John S. White, Washington, D. C., were on the briefs.

Sim T. Carman, Alexandria, Va., and Ralph A. Barney, Washington, D. C., with whom was Ramsey Clark, Asst. Atty. Gen., for appellee. Wilkinson, Cragun & Barker, Washington, D. C., filed a brief amicus curiae, Angelo A. Iadarola, Washington, D. C., of counsel.

Before JONES, Chief Judge, and WHITAKER, LARAMORE, DURFEE and DAVIS, Judges.

DAVIS, Judge.

We are called upon in this interlocutory appeal by the Indians[1] to decide

1. Taken under Section 20(b) of the Indian Claims Commission Act, 60 Stat. 1054, as amended by the Act of Sept. 8, 1960, 74 Stat. 829, 25 U.S.C. § 70s(b).

whether the Indian Claims Commission erred in lopping off two eastern and northern segments from a large area in Minnesota which it ruled was otherwise held by Indian title in 1855 when the United States acquired the region by cession. 8 Ind.Cl.Comm. 781, Docket 18–B (1960). Though evidently dissatisfied with the award of the remainder of the area to the Indians, the United States has not sought its own interlocutory appeal, preferring, it appears, to await the final termination of the suit after the decision on value which has not yet been made.[2]

The entire area involved in this proceeding before the Commission (known as Royce Area 357)[3] extends across north-central Minnesota around the headwaters of the Mississippi River, with a triangular shaped portion reaching north to the Canadian border; the area (less seven reservations within its perimeter) contains about 10.1 million acres. By the Treaty of February 22, 1855, 10 Stat. 1165, this large tract was ceded by the Mississippi, Pillager, and Lake Winnibigoshish bands of Chippewa Indians to the United States (with certain portions retained as reservations). The ownership of the area, and of its parts, is an essential element in the appellants' claim that the amount paid for the ceded land by the Government, under this Treaty, was an unconscionably low consideration.[4] After a trial, the Commission rejected the claimant's argument that their predecessors had recog-

nized title to Area 357, but it upheld the alternative contention that there was proof of Indian or original title to most of the area. The Commission excluded, as unsupported by this proof, the triangular portion going north to the Canadian border and also a substantial segment on the eastern edge of Area 357. These two excluded segments are the only portions as to which we are asked to rule at this interlocutory stage.

■ Unlike the Commission, we hold that the Indians did have recognized title to the two excluded sections at the time of the 1855 Treaty. It is unnecessary to decide precisely when this title was recognized by Congress; it is enough to hold, and that is all we do hold, that this recognition had fully matured by the time of the signing of the Treaty of 1855.[5] Recognition may have been perfected before, but in our view it was certainly no later. We are free to reach our own independent conclusion on this issue since it is a legal question involving the interpretation of treaties, not a matter of fact.

The history of Congressional dealings with the Chippewas begins, for our purposes, with the Prairie du Chien Treaty of 1825, 7 Stat. 272, which attempted to settle inter-tribal conflicts among the Chippewas, Sioux, Iowas, and the Sacs and Foxes, by drawing lines (in what is now Minnesota and Wisconsin) between the "respective countries" of the different tribes. Area 357 lies wholly on the Chippewa side of the boundary establish-

2. Under the Act, "the failure of either party to appeal from any such interlocutory determination shall not constitute a waiver of its right to challenge such interlocutory determination in any appeal from any final determination subsequently made in the case." 25 U.S.C. § 70s(b).

3. From Royce's maps in the 18th Annual Report of the Bureau of American Ethnology (Part 2), Indian Land Cessions (1896–1897).

4. Appellants calculate the total consideration for Area 357 to have been about $1.5 million, or about 15 cents per acre.

5. Since the interlocutory appeal provisions of the Indian Claims Commission Act specifically allow a non-appealing party to preserve its right to litigate at a later time those aspects of the challenged ruling which are adverse to it (see footnote 2, supra), it would seem wiser for this court, so far as fairly possible, normally to confine its decision on an interlocutory appeal to rulings which will decide only the issues presented to it and not the aspects of the case which may still be litigated further. This is particularly true where, as here, the non-appealing party does not appear to accept those parts of the Commission's decision which are adverse.

ed by Article 5 of this Treaty to divide the Chippewas from the Sioux living to the south. On the basis of the Treaty's purpose, the negotiations leading to it, its terms, and its subsequent treatment by the Government and the Indians, appellants urge strongly that the 1825 Treaty, in itself, constituted recognition of the Chippewas' claim to ownership of all land to the north of the line, including Area 357. The Commission and the Government answer that the Treaty merely drew, under the aegis of the United States, an open-ended boundary between warring tribes, and for the Chippewas did not circumscribe or enclose any area as concededly theirs. We pass the issue at this time, merely noting that Article 10 of the Treaty stipulates that "the United States agree to, and *recognize,* the preceding boundaries" between the tribes, and Article 13 provides that "no tribe shall hunt within the *acknowledged* limits of any other without their assent" (emphasis added).

There followed, after the 1825 Treaty, a series of agreements with the Chippewas culminating, for this case, in the 1855 Treaty by which Area 357 was ceded to the United States. The Treaty of August 5, 1826, 7 Stat. 290, bound the Lake Superior band of Chippewas (who had not attended the 1825 negotiations) to the 1825 Treaty and reaffirmed that agreement for the whole Chippewa Tribe. In Article 3 the Chippewas granted the United States "the right to search for, and carry away, any metals or minerals from any part *of their country.* But this grant is not to affect *the title of the land, nor the existing jurisdiction over it*"; by Article 4 the Chippewas "*grant*" to each of their halfbreeds certain land to be located by the President, "and as soon as such locations are made, *the jurisdiction and soil thereof are hereby ceded*" (emphasis added). In 1827, the Treaty of August 11, 1827, 7 Stat. 303, settled the segment of the line dividing the Chippewa "coun-

try" from that of the Menominees, left open by the 1825 Treaty.

Thereafter, from 1837 to 1855, the Federal Government entered into five treaties of cession with the Chippewas, in which these Indians ceded various lands on their side of the Chippewa-Sioux line marked by the Prairie du Chien Treaty of 1825. The first was the Treaty of July 29, 1837, 7 Stat. 536, which granted Area 242 in Chippewa "country" (to the southeast of Area 357 with which we are now dealing), leaving to the Indians the privilege of hunting, fishing, and gathering wild rice in this territory "during the pleasure of the President of the United States." [6]

Of special importance for the excluded segments of Area 357 involved in this appeal was the Treaty of October 4, 1842, 7 Stat. 591, with the Mississippi and Lake Superior Bands of Chippewas, ceding Chippewa land in Michigan and Wisconsin (to the east of Area 357)—again with the privilege of occupancy and hunting until required to remove by the President of the United States. Article III stipulated "that whenever the Indians shall be required to remove from the ceded district, all the unceded lands belonging" to the Lake Superior Chippewa and the Sandy Lake and Mississippi bands of Chippewas, "shall be the *common property and home of all the Indians,* party to this Treaty" (emphasis added). Even more definite was Article V which declared:

"Whereas *the whole country between Lake Superior and the Mississippi, has always been understood as belonging in common to the Chippewas, party to this treaty;* and whereas the bands bordering on Lake Superior, have not been allowed to participate in the annuity payments of the treaty made with the Chippewas of the Mississippi, at St. Peters July 29th 1837, and whereas *all the unceded lands belonging to*

6. On the 1837 Treaty, see Mole Lake Band of Chippewa Indians v. United States, 139 F.Supp. 938, 134 Ct.Cl. 478, 497–500,

(1956), cert. denied, State of Wis. v. United States, 352 U.S. 892, 77 S.Ct. 130, 1 L.Ed.2d 86 (1956).

*the aforesaid Indians, are hereafter to be held in common,* therefore, to remove all occasion for jealousy and discontent, it is agreed that all the annuity due by the said treaty, as also the annuity due by the present treaty, shall henceforth be equally divided among the Chippewas of the Mississippi and Lake Superior, party to this treaty, so that every person shall receive an equal share." [emphasis added].

In 1842 "the whole country between Lake Superior and the Mississippi", to which Article V refers, covered—in addition to the area then being ceded by the 1842 Treaty, another area to the west (Area 332) later ceded in 1854, and an area ceded still later in 1866—that part of Area 357 now in dispute, east of the Mississippi, including, we believe, both of the segments excluded by the Commission (which lie east and north of the Mississippi River). It was this region which the 1842 Treaty said had "always been understood as belonging in common to the Chippewas" and would thereafter "be held [by them] in common."

Likewise significant for this appeal were the preparatory documents preliminary to negotiations for further cessions in 1847. The texts of the resulting treaties (Treaty of August 2, 1847, 9 Stat. 904; Treaty of August 21, 1847, 9 Stat. 908), which ceded relatively small tracts south of Area 357 and west of the Mississippi, are not themselves of great importance but the preliminary reports by Government representatives show that the segments now in question were within the region considered by the defendant's officers to be Chippewa land under the earlier treaties. A map accompanying these officers' reports circumscribed in red dots an area marked "G", embracing the territories to the east of Area 357 plus that part of 357 itself which lay east of the Mississippi and of a line drawn from Lake Winnibigoshish to the Big Fork River—

plainly including all of one of the excluded sectors and a part of the other. On the basis of this map, the report stated that the "country within the dotted boundaries (G) * * * *and that immediately West to Upper Red River* * * * is what is termed the common property of the Chippewas of Lake Superior and the Mississippi River * *" (emphasis added), and that the then "unceded land East of the Mississippi * * * are by the terms of the Treaty of 1842, made the common home and property of the Indian parties to the Treaty." These statements appear to cover both of the omitted segments in this case. The same map also marked a straight red line running north from Lake Itasca (the source of the Mississippi, in the western portion of Area 357) to the Canadian border; the investigator reported that the lands west of the Mississippi and of this straight red line were "represented to be claimed by certain bands of Chippewas termed 'Pillagers'— who make no claim to any part of the land East of that line." (The second excluded segment lies east of this straight north-south line). Based on these reports, the official instructions to the treaty commissioners (in June 1847) directed them to obtain an agreement ceding (among other lands) those "unceded lands owned by" the Chippewa Indians of the Mississippi and Lake Superior east of the Mississippi and of a specified line to the international boundary—covering all of one excluded segment and part of the other. This directive to obtain such a large cession was unsuccessful at that time but, again, it authoritatively shows the position taken by the defendant's officials as to the then Indian ownership of most of the land disputed on this appeal.[7]

Perhaps even more enlightening was the Treaty of September 30, 1854, 10 Stat. 1109, under which, in the course of further cessions, "the Chippewas were divided into the Chippewas of Lake Su-

---

7. The text of the instructions to the treaty commissioners makes it clear that the Government did not deem the cession sought at that time 'as exhausting all of the remaining Chippewa-owned lands.

perior and the Chippewas of the Mississippi and were treated with as separate parties. By this treaty these two large subdivisions of the Chippewa Nation agreed on a north-south boundary line running through the eastern part of Minnesota which effected a division of the Chippewa country between them." Chippewa Indians of Minnesota v. United States, 80 Ct.Cl. 410, 462 (1935), affirmed 301 U.S. 358, 57 S.Ct. 826, 81 L.Ed. 1156 (1937). The treaty commissioners reported that, during the negotiations, they proposed a division of territory "on one side of which the country should *belong exclusively* to the Lake Superior and on the other side to the Mississippi Indians" (emphasis added)—to which the Indians readily agreed. By Article I the Lake Superior Chippewas ceded to the United States all the lands "heretofore owned by them in common" with the Mississippi Chippewas lying *east* of the eastern edge of Area 357, and were to receive payments in which the Mississippi groups would not share; significantly for our case, the Lake Superiors in turn relinquished to the Mississippis "all their interest in and claim to the lands *heretofore owned by them in common,* lying *west*" of the east boundary of Area 357 (emphasis added), i. e., covering, at the least, the eastern and northeastern part of Area 357. This reflects a clear understanding that both groups of Chippewas had previously owned the eastern and northeastern portion of Area 357 (at a minimum), but that thereafter only the "Chippewas of the Mississippi" would own it.

The 1854 Treaty led to the Treaty of February 22, 1855, 10 Stat. 1165, on which appellants ground their present claim of a cession for an unconscionably small consideration. Both treaties were viewed by the United States as part of a plan to buy as much as possible of the remaining Chippewa lands and to create reservations for these Indian groups. In its ceding portion the 1855 Treaty (Article I) refers to "the lands now owned

and claimed" by the Indians as well as to "Chippewa country", again exhibiting, in the light of the historical background, an acknowledgment of Indian ownership.

From this sequence of Treaty materials, extending from 1825 to 1855, we draw the conclusion that at least by 1855 the United States had recognized the Chippewas' title to the two segments of Area 357 excluded by the Commission from Chippewa ownership. Recognition does not turn on ritualistic wording in a treaty or statute, but on the legislative purpose, gleaned from the enactment, to acknowledge Indian ownership. "There is no particular form for congressional recognition of Indian right of permanent occupancy. It may be established in a variety of ways but there must be the definite intention by congressional action or authority to accord legal rights, not merely permissive occupation." Tee-Hit-Ton Indians v. United States, 348 U.S. 272, 278–279, 75 S.Ct. 313, 99 L.Ed. 314 (1955). See also Northwestern Bands of Shoshone Indians v. United States, 324 U.S. 335, 339–340, 349–350, 65 S.Ct. 690, 89 L.Ed. 985 (1945); Hynes v. Grimes Packing Co., 337 U.S. 86, 103–104, 69 S.Ct. 968, 93 L.Ed. 1231 (1949); The Miami Tribe of Oklahoma v. United States, 175 F.Supp. 926, 936–940, 146 Ct.Cl. 421, 439–446 (1959); Crow Tribe of Indians v. United States, Ct.Cl., decided Nov. 2, 1960, 284 F.2d 361, cert. denied, 366 U.S. 924, 81 S.Ct. 1350, 6 L.Ed.2d 383; Fort Berthold Indians v. United States, 71 Ct.Cl. 308, 333 (1930).[8] Such definite acknowledgment of legal ownership existed here at least by the time of the 1855 Treaty.

The events occurring from the Prairie du Chien Treaty of 1825 to 1842 may have already accorded that recognition. But, as we have indicated, we need not at this time unravel that earlier skein, for the 1842 Treaty declared in express terms that "the whole country between Lake Superior and the Missis-

8. See also the discussion of recognition in The Sac and Fox Tribe of Indians of Oklahoma et al. v. United States, 315 F.2d 896.

sippi, has always been understood as belonging in common to the Chippewas" (of the Mississippi and Lake Superior). This "whole country" thus formally recognized clearly covered all of one of the excluded segments (lying due east of the Mississippi) and appears also to have included the other (which lies to the north and east of the river). For the future, the 1842 agreement provided that the still unceded lands "belonging to the aforesaid Indians" to the west of the easterly cession then being made—again including the two disputed segments—"shall be the common property and home" of the Indians and "are hereafter to be held in common." Shortly thereafter the official Government reports prior to the 1847 treaties made it even more definite that both excluded segments lay within territory which under the 1842 agreement was acknowledged as "the common property" of the Indians, and "owned" by them. And if sufficient recognition in the technical sense had not been granted by the 1842 Treaty, the 1854 Treaty closed the gap. The latter agreement divided the then remaining unceded territory between the Lake Superior Chippewas and the Mississippi Chippewas; the general area in suit, which was characterized as "heretofore owned" by the two groups "in common", was assigned to the Mississippis. The treaty commissioners told the Indians that thereafter the land on the west side of the dividing line (including the two omitted areas) was to "belong exclusively" to the Chippewas of the Mississippi. Since these bands were relinquishing all interest to the lands on the other side of the new line, and were also giving up all right to monetary compensation for that land, they must, in turn, have received (or been confirmed in) permanent rights to that territory on their side of the new boundary which was now declared to be theirs alone. In view of what had transpired in the past, of the terms of

the treaty, and of what they were told, the Indians must have believed this to be so; and it is hard to read the treaty words against the background of the prior agreements and of the preparatory materials without sensing that the Government's representatives must have had the same concept in mind.

In the light of these two treaties, 1842 and 1854, it is wholly proper to read the critical reference in the 1855 compact to "the lands now owned and claimed" by the Indians—insofar as these words relate to the disputed segments—not as a mere catch-all phrase covering all land to which the Indians asserted or could conceivably assert a claim (see The Sac and Fox Tribe of Indians of Oklahoma, et al. v. United States, 315 F.2d 896), but as a continuing acknowledgment of recognized and concrete legal rights.[9] At least with respect to the eastern and northern parts of Area 357, Congressional recognition was plain by 1855, and the limits of the recognized territory were sufficiently definite. The Indian Claims Commission erred as a matter of law in holding otherwise as to the excluded segments.

■ Having decided that the two portions of Area 357 which the Commission excised from its ruling that the ceded area was held by aboriginal title were nevertheless held by the Indians by recognized title, we can pretermit consideration of the Commission's findings on aboriginal title. We point out, however, that there should be no difference, in the standards for valuing Area 357, between the part determined by the Commission to have been held by Indian title and that part which we decide was held by recognized title. The recognition of title means no more, in this instance, than that appellants are freed from proving aboriginal use and occupancy (The Miami Tribe of Oklahoma v. United States, supra, 175 F.Supp. at 929, 146 Ct.Cl. at 426); it does not carry with it

---

9. The area thus characterized was very different from those territories ceded by prior treaties (1837, 1842), on which the Indians were permitted to continue to hunt and live during the pleasure of the President. Those were mere temporary privileges of permissive occupation embodying no legal rights.

any higher standard of compensation or valuation than would be true if the Commission had determined that the proof of use and occupancy sufficed as to the whole of Area 357 (175 F.Supp. at 942, 146 Ct.Cl. at 426).

In holding that the appellants had shown Indian title to most of the area, the Commission divided, by specified boundaries, the lands to be valued between the Mississippi bands of Chippewas, on the one hand, and the Pillager and Lake Winnibigoshish bands of Chippewas, on the other. Most of the area was attributed to the latter. Appellants claim that it was error thus to create two separate tracts calling for two separate valuations, and that Area 357 should be valued, in its entirety, as one cession by the Chippewas to the Federal Government. Now that we have set aside the Commission's exclusion of the two segments from the territory it assigned to the Mississippi bands, the whole of Area 357 will have to be valued by the Commission. We are uncertain of the significance, in these circumstances, of the separation of the area between the two sets of bands, except possibly in the ultimate distribution of the proceeds of a judgment for appellants. We are also uncertain whether the Commission would make the same demarcation (if one continues to be necessary) in the light of our holding. At this interlocutory stage, it is better, therefore, to vacate without prejudice the part of the Commission's order separating the territory (as well as the ruling that the two divisions of Indians held title to a distinct and separate area of land) and to leave the Commission and the parties free to reconsider whether and to what extent the Commission's order should attribute parts of Area 357 to the various bands

or whether an award should simply be made to the Minnesota Chippewa Tribe on behalf of the Mississippi, Pillager, and Lake Winnibigoshish bands of Chippewas, without further specification or division.

■■ Finally, there is a point—as to the parties who are properly entitled to an award—which is no longer in controversy. The Commission's order declared that the Minnesota Chippewa Tribe "is entitled to maintain this action in a representative capacity on behalf *of all the descendants* of the Mississippi bands of Chippewas and the Pillager and Lake Winnibigoshish bands of Chippewas who were parties to the Treaty of February 22, 1855," regardless of their present-day membership in the Tribe (emphasis added). Appellants and a brief *amici* attacked this setting of a foundation for an award to individual "descendants," on the ground that the present tribal groups, not the individual descendants of the Indians of 1855, are those to whom awards must be made under the Indian Claims Commission Act. At the oral argument the defendant suggested that the Commission's order and findings should be modified to delete the references to "descendants", and to provide instead that the Minnesota Chippewa Tribe is entitled to maintain this action in a representative capacity on behalf of those bands of Chippewas (the Mississippi bands and the Pillager and Lake Winnibigoshish bands) who were parties to the 1855 Treaty. We agree. Tribal lands are communal property in which the individual members have no separate interest which can pass to their descendants who are no longer members of the group.[10] The same rule is applicable under the Indian Claims Commission Act (except possibly in extra-

---

10. Western Cherokee Indians v. United States, 27 Ct.Cl. 1, 53 (1891) modified and affirmed 148 U.S. 427, 13 S.Ct. 650, 37 L.Ed. 509 (1893); Journeycake v. Cherokee Nation and United States, 28 Ct.Cl. 281, 302–303 (1893), affirmed, 155 U.S. 196, 15 S.Ct. 55, 39 L.Ed. 120 (1894); Prairie Band of Potawatomi Indians v. United States, 165 F.Supp. 139,

143 Ct.Cl. 131, 143–144, 152 (1958), cert. denied, 359 U.S. 908, 79 S.Ct. 587, 3 L. Ed.2d 574 (1959); Whitefoot v. United States, Ct.Cl., decided July 19, 1961, 293 F.2d 658, 661–663; Federal Indian Law (1958), pp. 584–585, 593, 746, 751–752; Cohen, Handbook of Federal Indian Law (1942), pp. 143–144, 183–187, 288.

ordinary cases). The purpose and structure of the Act, which specifically demands that the claim be on behalf of the entity not individuals (25 U.S.C. § 70a; 25 U.S.C. § 70i), show that the unit is entitled to the award.[11] The dictum in McGhee v. United States, 122 Ct.Cl. 380, 388, 396 (1952), cert. denied, 344 U.S. 856, 73 S.Ct. 91, 97 L.Ed. 665, that that particular claim "belonged" to "descendants" of the whole Creek Nation as it existed in 1814, is inapplicable to a case, like this, in which suit is brought on behalf of all interested groups, bands, or entities.[12] At least in such proceedings the Indian Claims Commission Act requires that the awards be made, not to individual descendants of tribal members at the time of the taking, but to the tribal entity or entities today. In this case, the tribal entity is the Minnesota Chippewa Tribe on behalf of the Mississippi, Pillager, and Lake Winnibigoshish bands.[13]

The interlocutory order of the Commission is reversed insofar as it determines that the Indians did not have sufficient ownership and title to the two "excluded segments" of Area 357; is modified as indicated in this opinion with respect to those on behalf of whom the Minnesota Chippewa Tribe and the other appellants appear in this proceeding; and is vacated without prejudice, as indicated in this opinion, with respect to the determination that the Mississippi bands and the Pillager and Lake Winnibigoshish bands held title to separate and distinct areas of land as specified by the Commission. The case is remanded for further proceedings consistent with this opinion.

JONES, Chief Judge (dissenting in part).

I dissent from that part of the majority opinion which reverses the Indian Claims Commission as to the two segments of the Royce Area 357 which the Commission excluded from any claim of title by the appellants.

As to these two segments the Commission found as a fact that the evidence does not establish any exclusive use and occupancy of these areas by either of the appellant bands, and that therefore their claim of original Indian title to this area must fail. The Commission added that there is evidence that the petitioner Chippewas did travel over the area to British outposts at Rainy Lake to obtain ammunition for warfare against the Sioux. The Commission found that this, of course, is not sufficient proof of Indian title.

The majority opinion takes the position that proof of any form of Indian title or continued occupancy or use was unnecessary primarily because of the language of Article V of the Treaty of October 4, 1842. In other words, the part of the majority opinion which reverses the Commission as to the two segments rests almost altogether on the provisions of Article V of that Treaty and some other scattered comment. The Article is quoted in the majority opinion. It will be noted that the language which the majority opinion underscores is in one of the "whereas" clauses and not in the cession or determinative part of the Treaty.

The basic part of the Article and the main object of the Treaty was the pro-

---

11. Congress has full power, of course, to determine that an award to a tribal entity should be expended or paid in a specified manner. See, e. g., McCalib v. United States, 83 Ct.Cl. 79, 85 (1936).

12. The eastern Creeks, seeking an interest in that claim, were not themselves organized and would not have benefited at all from an award to the organized Oklahoma Creeks.

13. For the same reason we disapprove, as erroneous in law, the Commission's find-

ing that the individual Indians named as petitioners are entitled to maintain the action "on behalf of themselves and in a representative capacity for all descendants of the former bands similarly situated."

As we understand appellants' presentation to this court, they do not ask us to decide that the award should run to the Minnesota Chippewa Tribe without any reference to the bands, so long as the references to "descendants" and to individual entitlement are omitted.

vision that all the funds which largely consisted at that time of a distribution of the funds made available by the cession of Area 261, as well as a distribution of the annuity payments due by the treaty then being executed, "shall henceforth be equally divided among the Chippewas of the Mississippi and Lake Superior, party to this treaty, so that every person shall receive an equal share."

The other part of the Article was of a general nature and not specific enough to obviate the necessity of establishing Indian title in the normal way. The different tribes of Indians had been fighting among each other and this Article was largely intended as as assurance that the annuities derived from Area 261 and any annuity under the Treaty then being executed are funds flowing from any unceded lands "belonging to the aforesaid Indians, or hereafter to be held in common."

This was not intended to be a cession of title to lands in which the Indians did not have a claim. Surely this was not intended as a full recognition of title and ownership to all the land between Lake Superior and the Mississippi River without any definite limits north or south which would include many millions of acres. Certainly this statement of a general nature in the first clause of Article V should not be construed as sufficient to accomplish such an end and to cause such a recognition of title in the appellant tribes to the entire area as would obviate the necessary proof of Indian title. The recognition must be clear, explicit, and intentional, and the boundaries must be sufficiently described to enable calculation of acreage with reasonable certainty.[14]

When the provisions of Article V of the Treaty of 1842 are read in connection with the other Articles of that Treaty and with the provisions of the other treaties to which the provisions of the Treaty of 1842 make reference, it becomes apparent that the sweeping language of the first part of Article V was not meant to recognize ownership of all that vast area but only as to such of that inclusive area as the background proved they had title by occupancy and use and such additional lands as had been actually ceded to them. This and the other treaties disclose that there were many other tribes who had an interest in this area, some of which were described by metes and boundaries. There were also interests of other Chippewa tribes.

The Commission also found as a fact that in aboriginal times there were two divisions of Chippewas who owned separate and distinct tracts of land within Royce Area 357. These two bands included what is now the three appellant bands.

Many of these facts found by the Commission and certain provisions of other treaties should not be disregarded because of some general language of recital in a whereas clause of one article of a treaty.

I would approve that portion of the opinion, order and conclusion of the Indian Claims Commission which excludes the two segments of Royce Area 357 from any claim by the appellant Minnesota Chippewa Tribe and the bands for whom the action is brought in a representative capacity.

I dissent from that part of the majority opinion. In all other respects I concur in the conclusion reached by the majority.

WHITAKER, Judge, joins in the dissent.

14. Tee-Hit-Ton Indians v. United States, 348 U.S. 272, 75 S.Ct. 313, 99 L.Ed. 314 (1955). See also Northwestern Bands of Shoshone Indians v. United States, 324 U.S. 335, 65 S.Ct. 690, 89 L.Ed. 985 (1945).