CoweN, Chief Judge,
delivered the opinion of the court:
In this appeal the Yankton Sioux seek review of two determinations by the Indian Claims Commission adverse to their interest.
In an order entered January 12, 1962, the Commission held that it had no jurisdiction to adjudicate appellant’s claim to that portion of the land ceded by the Treaty of July 15, 1830, Art. 1, 7 Stat. 328, and the Treaty of October 21,1837,7 Stat. 542, which lies north of a line described in Article 2 of the Treaty of August 19, 1825, 7 Stat. 272. The land ceded by the above-mentioned treaties is depicted in Boyce’s maps of Indian Land Cessions in Iowa, Missouri, and Minnesota (B.A.E., 18th Ann. Bep. 1896-1897, part 2) as Area 151, and will hereinafter be referred to as that part of Boyce Cession 151 lying north of the Article 2 line.
In an earlier order entered November 25, 1959, the Commission fixed the location of that part of the Article 2 line of the Treaty of August 19,1825, supra, which is relevant to appellant’s claim to the northern portion of Boyce Cession 151. In that decision the Commission found that a point in the next to the last call of the treaty fixing the Article 2 line was the fork formed where the present day Bock Biver enters the Big Sioux (or Calumet) Biver some 40 miles above the confluence of the Big Sioux and the Missouri Biver.
The order of January 12,1962, arose out of two land claims set forth by the Yankton Sioux in an original petition filed before the Indian Claims Commission on August 11, 1951, docket No. 332. This petition was amended on February 12, 1958, separating the general accounting claim originally included into a distinct docket by itself, No. 332-B. Docket 332-A contained the land claims as originally pleaded. The *568 first claim concerned Royce Cession 410 and tlie Fort Laramie lands and is of no concern to us in this appeal.
The second land claim, as far as this appeal is concerned, was argued by appellant to include claims for Royce Cession 151 under the taking Treaties of July 15, 1830, 7 Stat. 328, and October 21, 1837, 7 Stat. 542. The Commission concluded, Commissioner Scott dissenting, that it was “unable to find within the bounds of the original petition in Docket 332, as well as in the amended petition, any language which could reasonably be interpreted as a statement by the petitioner tribe of a claim for additional compensation for the lands within Royce Area 151. . . Acting under its interpretation of Section 12 of the Indian Claims Commission Act, 60 Stat. 1049, 1052, 25 TJ.S.C. § 70k (1964 ed.), which provides that the jurisdiction of the Commission should be limited to those claims filed within 5 years after the date of approval of the Act (August 13, 1946), the Commission refused to allow an amendment to the pleadings to conform to the evidence which, after full trial and without jurisdictional objection by the defendant, showed Yankton ownership of the northern portion of Royce Cession 151.
We agree with the Commission that its jurisdiction cannot be extended by agreement of the parties in a case before it, and absent the necessary pleading, the right to recover is precluded. However, we do not agree that appellant’s pleading is insufficient to meet the requirements of Section 12 of the Indian Claims Commission Act. Commissioner Scott has written a dissent thoroughly discussing the point and, agreeing with his view as we do, there is no need to belabor the query with a rehash of Ms exposition of the logical and historical reasons for allowing the claim to Royce Cession 151 to be determined on its merits. It is sufficient for our purposes of review to note several factors which sum up our conclusion and require reversal of that portion of the Commission’s order relating to the jurisdictional point.
First, the wording of paragraph 8-b of appellant’s petition in docket No. 332-A, while exceedingly broad and comprehensive, did in fact include Royce Cession 151. That paragraph stated in part that “the petitioner * * * owned *569 or occupied certain portions of the lands enclosed by the following boundaries * * *” and, as the Commission said, “then there follows a lengthy description of a vast area encompassing some nine states and some 85 million acres, including all of Noyce Area 151.” Under the circumstances of the time interval between Indian occupancy of the land (into which settlement was rapid after the mid-1800’s) and the date for filing the petitions, the uncertainties of Indian title to any of this land and the time pressures for filing the claims before the Commission, we cannot say that appellant’s claim is so broad or indefinite that it fails to allege any cause of action, since the area in controversy was in fact included in the land claimed. There are indications that at the time the claim was filed it was as specific as possible. Second, we note that defendant had no difficulty at all answering or defending the claim on account of its broadness, for it knew what the controversy was concerned with and defended well. Third, we take cognizance of the liberality in pleading before judicial tribunals in these modern times, as fully discussed by Commissioner Scott, and need but mention that the Commission is bound both by the rules it has adopted and the spirit of the Indian Claims Commission Act to this liberality in procedure. Finally, we note that the appellee Indian tribes, whose interests are sharply adverse to those of appellant, agree that appellant’s contentions on the jurisdictional issue are well taken.
Therefore, we conclude that the Yankton Sioux claim for additional compensation for the cession to the United States of their interest in Noyce Cession 151 under the Treaties of July 15, 1830, 7 Stat. 328, and October 21, 1837, 7 Stat. 542, was timely filed pursuant to Section 12 of the Indian Claims Commission Act and has not been extinguished by operation of law.
The order of November 25, 1959, is, however, a different matter, for we uphold the determination of the Commission, although for reasons someAvhat different than those set forth by the Commission in its per curiam explanation of its order.
In dockets 11-A and 138 the Commission issued its findings of fact and opinion establishing that the petitioners therein, *570 the Sac and Fox, Iowa, Omaha, and Otoe and Missouria Tribes of Indians, by virtue of the 1825 and 1830 Treaties referred to above, each had a one-fourth interest in that portion of Boyce Cession 151 located south of the Article 2 line. 5 Ind. 01. Comm. 316 (1957). The Commission did not at that time determine the location of the line, but it was assumed by the parties to have the Bock Biver fork of the Big Sioux Biver as its westernmost point, before the line proceeded down to the Missouri Biver. The Yankton Sioux disputed this assumption, claiming instead that the “lower fork” of the Big Sioux is not the Bock Biver but was instead a stream known as the “Cherah” which flows from the east into the Big Sioux about 3 miles from the juncture of the Big Sioux with the Missouri, and on September 8,19591, the Commission ordered the consolidation of appellant’s docket No. 332-A with dockets Nos. 11-A and 138 for the limited purpose “of the determination by the Commission of the location of the line described in Article 2 of the Treaty of August 19, 1825 (7 Stat. 272).”
Article 2 of the Treaty of 1825, setting forth what is often referred to as the “Sioux-Sac & Fox line,” or “Yankton line,” read in pertinent part as follows:
It is agreed between the confederated Tribes of the Sacs and Foxes, and the Sioux, that the Line between their respective countries shall be as follows: Commencing at the mouth of the Upper Ioway Biver, on the west bank of the Mississippi, and ascending the said Ioway river, to its left fork; thence up that fork to its source; thence crossing the fork of Bed Cedar Biver, in a direct line to the second or upper fork of the Desmoines river; and thence in a direct line to the lower forlc of the Gdbu-met river; and down that river to its juncture with the Missouri river. But the Yancton band of the Sioux tribe, being principally interested in the establishment of the line from the Forks of the Desmoines to the Missouri, and not being sufficiently represented to render the definitive establishment of that line proper, it is expressly declared that the line from the forks of the Desmoines to the forks of the Calumet river, and down that river to the Missouri, is not to be considered as settled until the assent of the Yancton band shall be given thereto. * * * [Emphasis added]
*571 Although, they were not sufficiently represented to sign the treaty, the assent of the Yankton Sioux was finally obtained, after the Treaty of July 15, 1830, 7 Stat. 328, at Prairie du Chien, in which Noyce Cession 151 was; made, in a subsequent meeting at St. Louis on October 13,1830.
The Treaty of 1825 and its Article 2 line constituted an attempt by the United States to settle tribal differences over those portions of the lands around the Mississippi and Missouri Eiver systems upon which the Indians were still hunting and living prior to white settlement. See discussion of the treaty and its background in Minnesota Chippewa Tribe v. United States, 161 Ct. Cl. 258, 315 F. 2d 906, 908-911 (1963). The area between the Mississippi Eiver and the Missouri Eiver, roughly the length of Iowa, was the subject of a division between the Sioux on the north and the Sac and Fox, Iowa, Omaha, and Otoe and Missouria tribes on the south. The portion of the dividing line running from the Mississippi Eiver to the second or upper fork of the Des Moines Eiver is not in dispute. What is in issue is the call of Article 2 for the line to continue from the second or upper fork of the Des Moines Eiver “and thence in a direct line to the lower fork of the Calumet river; and down that river to its juncture with the Missouri river.”
In determining that the present day Eock Eiver formed the lower fork of the Big Sioux or Calumet Eiver, the Commission declined to rest its decision upon either the maps in evidence or the contemporary statements of the Indians and United States Treaty Commissioners who were in attendance at the treaty negotiations. The Commission noted that the maps had no indication of source and that other evidence introduced “concerns itself with the respective territorial claims of the tribes and is more argumentative than probative insofar as determining the western terminus of the Sioux-Sac and Fox line.” Instead, the Commission felt that it had enough descriptive language in the Treaty of 1825 itself, when considered together with the 1830 Treaty, to indicate that the lower fork of the Calumet or Big Sioux was the Eock Eiver and not the Cherah Eiver as contended by appellants.
Before the assent of the Yankton Sioux to the 1825 Treaty *572 could be obtained, warfare broke out among some of the Indian tribes who were parties to that treaty. A new treaty council was convened at Prairie du Chien on July 7, 1830. The first business of the council was to establish peace, and on July 10,1830, a treaty of peace and friendship was made between the confederated tribes of Sac and Fox and the Sioux, Winnebagoes and Menominee, and assented to by the Omaha, Iowa, and Otoe and Missouria tribes of Indians. By Article 2 thereof, the line fixed by Article 2 of the Treaty of 1825 was reestablished. Although the Yankton Sioux were not present, they gave their consent to this treaty on October 13, 1830. ■ General Clark and the other treaty commissioners then proposed a solution to the conflicting claims within the area later designated as Boyce Cession 151. It was recommended that the entire area be ceded to the United States for use as a common hunting ground for the Sac and Fox, and others who might be designated or located upon it by the President of the United States. The proposal was accepted and the cession was made by Article I of the Treaty of July 15,1830, 7 Stat. 328. The Yankton Sioux, who were absent, agreed to this treaty on October 13,1830. In Articles II and III of the same treaty, the Indians also ceded to the United States lands lying north and south of the line established by Article 2 of the Treaty of August 19,1825. Such lands were situated between the Mississippi and Des Moines Bivers. The northern boundary of the cession as set forth in Article I of the treaty read in part:
Beginning at the upper fork of the Demoine Biver and passing the sources of the Little Sioux, and Floyds Bivers, to the fork of the first creek which falls into the Big Sioux or Calumet on the east side; thence down said creek, and Calumet Biver to the Missouri Biver; * * *.
The first creek falling into the Big Sioux on the east side, at the point the line passed the sources of the Little Sioux and Floyds Bivers, is, as depicted by Boyce, and without dispute, the Bock Biver. The Commission found this fact intriguing and held that because the Bock Biver was part of the boundary line of Boyce Cession 151, its fork “is identical with the western terminus of the 1825 Article 2 line, the *573 ‘lower fork of the Calumet River.’ ” Tbe Cberah River was, tbe Commission found, “too far below a point necessary to connect with tbe northern boundary line of Eoyce 151 in tbe 1830 call.” Having searched the evidence and material concerning the two treaties, we cannot find in tbe 1830 Treaty alone sufficient guidelines to decide the present dispute. However, a comparison of the two treaties show’s that the beginning point of the July 15, 1830 Treaty and the beginning point of one call in the 1825 Treaty are the same, i.e., the upper forks of Des Moines River. The 1825 Treaty line then proceeds directly to the lower fork of the Calumet River, while the 1830 Treaty line proceeds indirectly to the first creek which falls into the Calumet; both calls have the same beginning and ending points. The next segment of the 1830 Treaty boundary and the last segment of the 1825 Treaty both follow the Calumet down to its confluence with the Missouri. The Rock River is thus a common point in the calls of both treaties.
It is significant, as the Commission noted, that the river which forms the “lower fork” is not named. This indicates that the river was a well known topographical feature, although it may or may not have had a name at that time. The Rock River was, the evidence shows, a stream of some significance and the only river approaching the Big Sioux in magnitude. The stream designated by appellants as the “Cherah”, and contended for as the present day Broken Kettle River, is a mere rivulet compared to the Big Sioux. On the basis of size alone and laying other factors aside, we think it reasonable that the call went to the Rock River rather than the Cherah. See Yakima Tribe v. United States, 158 Ct. Cl. 672 (1962). According to the various maps in evidence, there are around 12 streams of minor importance, including the Cherah, flowing into the Big Sioux between its mouth and the Rock River. In a treaty call extending approximately 100 miles from a point on the Des Moines River, it is unlikely that the line would head for something less prominent than a Rock River.
The appellant argues that the documentary evidence demonstrates that the parties to the 1825 Treaty “understood *574 the western terminus of the line to be near the mouth of the Calumet or Big Sioux, and not to Rock River which was the thirteenth stream above the mouth and far removed from the area in controversy.” This argument is based on the incorrect premise that the Article 2 line of the 1825 Treaty terminated at the lower fork of the Calumet; the last call of that treaty hits the fork of the Calumet and then runs down that river to its j unction with the Missouri. Thus the termination of the Article 2 line was not near but at the mouth of the Calumet.
If, as appellant contends, the parties had intended the treaty line to run directly to a point near the mouth of the Calumet, it is difficult to understand why the treaty call did not run in a direct line from the Des Moines to the mouth of the Calumet, a prominent location and one much referred to in the pre-treaty negotiations. Instead, the language of the treaty “down that river” [the Calumet] conveys the concept of a line running for some distance down the Calumet. It hardly describes a scant 3-mile span. Rock River, some 40 miles above the mouth of the river, appears to foe the point referred to in the next to the last call of the treaty.
We have examined the journal of the proceedings of the treaty council convened to conclude the Treaty of August 19, 1825, and find none of such documentary evidence to be conclusive on the issue before us. On the whole, however, we believe it lends greater support to the decision of the Commission than to appellant’s position.
On August 10,1825, Keokuck, the Sac chief, in addressing the Indians stated:
We claim the Fork of the Calumet River — It is unnecessary to say by what title we claim it — you know we got it — This is the line for which my mouth has spoken so much. (Yankton Exhibit 80, p. 2.)
There seems to have been little doubt among the parties that the fork described in the treaty call was most prominent, and since it was so considered, the descriptive adjective “lower” was not necessary in their minds. Cf. Yakima Tribe v. United States, supra.
Oil the following day, the journal stated:
*575 The Socs and Foxes stated that they had agreed with the Sionx upon a line — The principal Sioux also stood up & stated they had agreed. A map was produced by the Socs and Foxes & the both parties followed the line marked up the map. Upon examining however the Sioux as to their understanding of the point on the Missouri where the line was to terminate it was found that the Sioux believed that the line was to strike the Missouri by following Bear Creek from its former to its junction with the Missouri below the Council Bluff (Bear Creek is supposed to be Bowyer River) The Socs & Foxes on the contrary believe that the line strikes a fork of the Calumet River (Sioux River of our maps) & follows it down to its junction with Missouri above the Maha Village. (Yankton Exhibit 80, p. 2.)
Three days later, the tribes met and said that they had come to an understanding as follows:
After a consultation both parties advanced & said they had come to an agreement. The map was procured and the same line originally proposed by the Socs & Foxes was agreed to by the Sioux. The termination of the line on the Missouri was carefully explained to the Sioux who clearly understood it [to] be at the mouth of Sioux River & gave their assent thereto. (Yankton Exhibit 80, p. 3.)
The line referred to in the foregoing extract, the boundary proposed by the Sac and Fox Tribe, was incorporated in the treaty, but the treaty expressly provided that since the Yank-ton Sioux Tribe was not sufficiently represented, the line was not to be considered as settled until that tribe gave its assent thereto.
In the journal of the treaty proceedings of August 16, 1825, the following statement is attributed to the treaty commissioners:
The Commissioner stated to the Soc Foxes & Sioux, that they were not satisfied with the boundary line between them going from the Forks of the Des Moines up to Calumet River — They wished to establish a neutral fround between a line drawn from the 2nd fork of the es Moins to the junction of Calumet River and the Missouri & from the 2nd Fork of the Des Moins to the source of Bear or Bowyer River & to the Missouri. The land between these lines to be considered as a common hunting ground for both parties until the assent of the *576 Yankton of the Missouri had been given to the one running to the Calumet. That it was true, that the Yank-tons of the Missouri had told the Agent of the U.S. on that Eiver that they would agree to anything done by Govr. Clark, but that Gov. Clark would, not assent to the line running to the Calumet Eiver without getting the formal consent of the nation. (Yankton Exhibit 80, pp. 3-4.)
The appellee Indian tribes rely heavily on the use of the word “up” and argue that it shows the parties understood that the Eock Eiver was the point on the Big Sioux to which the line ran. The word “up” does dovetail with the direction of the Article 2 line as found by the Commission. By its determination, the line runs up in a northwesterly direction from the forks of the Des Moines, whereas a running of the line to the Cherah Eiver would be down in a southwesterly direction.
We have also studied the two maps in evidence which show the Article 2 line. The early map (Yankton Exhibit 80, page 27) supports appellant’s contention for it shows a line running roughly near the location of the Cherah Eiver. However, the line does not begin where the Article 2 treaty line began and does not correspond with the treaty language in other respects. Moreover, the map does not designate what the line represents. A later map (Yankton Exhibit 80, page 28) shows a line running to Eock Eiver as found by the Commission and is designated by the cartographer as the “Boundary Between Sioux and Sacs and Foxes — Aug. 19, 1825 — 7 Stats 272.” This map also has certain inaccuracies, particularly the beginning points set forth in the Treaties of 1825 and 1830. With respect to both maps, we agree with the Commission’s finding that neither indicates the source upon which it is based.
The reference in the disputed call of the 1825 Treaty to “lower fork of the Calumet river” is the strongest piece of evidence in appellant’s favor. Appellant points out that insofar as the territory at issue is concerned, there is no fork or any stream of any size above the Eock Eiver that could be described as an upper fork of the Calumet. When the entire record is considered, however, appellant has failed *577 to demonstrate tbe existence of a fork of the Calumet lower than the Bock Eiver which could be considered a fork to which a treaty call probably would have been made in light of the circumstances existing at the time of the treaty.
The question to be decided is by no means free from doubt but the appellant has not persuaded us that the Commission’s determination was erroneous, whether it be considered as a decision on a question of law or one on a mixed question of law and fact.
In summary, we refer to the court’s language in -the Yakima case, supra, at 685:
We see no sufficient reason to override the Commission’s solution. It has its difficulties, of course, but they are less (and certainly no greater) than those presented by appellant’s position; and giving due weight to the Commission’s factual findings (which are supported by substantial evidence) we cannot say that appellant has shown any legal error in interpretation of the Treaty or application of its provisions.
Finally, we conclude that the Commission did not err in denying appellant’s motion to reopen the record for the presentation of allegedly newly discovered evidence, which appellant claimed showed that the Cherah Eiver was the present day Broken Kettle Eiver, a stream 3 miles above the Big Sioux and corresponding to the point claimed by appellant. Appended to appellant’s motion were affidavits of several members of the Sioux Tribe to the effect that the word “Cherah” is a phonetic approximation of the Sioux word “ce-ga”, meaning “kettle.” The knowledge of the Sioux language and the meaning of the word “ce-ga” or “Cherah” must be attributed to the appellant tribe and was not newly discovered evidence of the type that would compel a reopening of the case. McCullough Tool Co. v. Well Surveys, Inc., 343 F. 2d 381, 410 (10th Cir. 1965).
For the reasons stated above, the Commission’s order of January 12,1962, is reversed, but its order of November 25, 1959, is affirmed.